**Zhi Jun XU, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 04–01–00266–CR.**

Court of Appeals of Texas,
San Antonio.

Dec. 24, 2002.

Discretionary Review Refused
June 4, 2003.

---

Robert O. Switzer, San Antonio, for Appellant.

Enrico B. Valdez, Asst. Crim. Dist. Atty., San Antonio, for Appellee.

Sitting: CATHERINE STONE, Justice, PAUL W. GREEN, Justice, SARAH B. DUNCAN, Justice.

Opinion by: SARAH B. DUNCAN, Justice.

Zhi Jun "Frank" Xu appeals the trial court's judgment convicting him of murder and sentencing him to twenty-five years imprisonment. We hold the trial court erred in denying Xu's motion to suppress his second written statement and therefore reverse the trial court's judgment and remand the cause for further proceedings consistent with this opinion.

## STANDARD OF REVIEW

We review a trial court's suppression ruling under the abuse of discretion standard. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997). Under this standard, we afford almost total deference to a trial court's determination of historical facts supported by the record, especially when the findings are based on an evaluation of credibility and demeanor. *Id.* However, the trial court's resolution of mixed questions of law and fact, which does not turn on an evaluation of credibility and demeanor, is reviewed de novo. *Id.*

The trial court ruled that Xu's second statement was not the product of custodial interrogation. As to the circumstances of the interrogation, Xu's testimony and that of the investigating officers is generally consistent. Accordingly, the trial court's ruling that Xu's second statement was not a product of custodial interrogation does not turn on an evaluation of credibility and demeanor and must be reviewed de novo. *See id.*

## FACTUAL AND PROCEDURAL BACKGROUND

Shortly after midnight on January 6, 1999, Xu's wife, Melissa Wang, died. Unconscious and with a bluish skin tone, Melissa had been brought by her family to the emergency room. Cardiopulmonary resuscitation and intubation were performed but proved unavailing. Whenever there is a death at the hospital, San Antonio police are called. Officer Piotrowski read Xu his *Miranda* rights and then interviewed him regarding the circumstances of Melissa's death, which Xu attributed to a seizure. Detective Giddings also conducted a brief inquiry at Xu's home; in his 4:00 a.m. report, he concluded there was no sign of a struggle. Dr. Hersh, Melissa's attending physician, concluded Melissa's death had been caused either by cardiac arrhythmia or an aneurysm.

Sometime during the morning of January 6, the medical examiner determined the cause of Melissa's death was strangulation. Accordingly, at 10:55 a.m. on January 6, an investigation into Melissa's death was opened and assigned to Detective Holguin. Holguin reviewed the file, which consisted in major part of Piotrowski's and Giddings' "apparent sudden death" reports. After Holguin's partner, Detective Escobar, told Holguin that the medical examiner had concluded the cause of Mel-

issa's death was strangulation, Holguin changed the offense classification in the previous reports to strangulation. At noon, Holguin called Xu and asked him to meet him at Xu's home. Xu agreed to do so.

When Holguin and Escobar first arrived at Xu's home, Holguin asked Xu to sign a consent to search form. Xu complied. Holguin next asked Xu to show him where Melissa collapsed. Again, Xu complied. Neither Holguin nor the four or five evidence technicians who searched the house during the remainder of the afternoon found evidence of a struggle or any other evidence that Melissa had been strangled. After twenty or thirty minutes, Holguin asked Xu and Melissa's sister, Shuang, to come to the police station for interviews. Xu and Shuang agreed; and, at approximately 1:00 p.m., a friend of Xu's drove Xu, his brother, and Shuang to the police station.

Upon arriving at the station, Xu and Shuang were placed in separate rooms. Initially, Xu completed a personal information form. Then, after providing Xu with a bottle of water, Detective Holguin began to interrogate Xu. At 1:56 p.m., Holguin began typing Xu's first statement. At 3:35 p.m., it was signed by Xu. In his first statement, Xu states he had been informed he was not under arrest and was free to leave. Holguin testified he did not give Xu his *Miranda* rights either at Xu's home or later at the police station, because he did not believe either interview was a custodial interrogation.

According to Xu in his first statement, he and Melissa had known each other since they were children in China, had been married approximately seven years, and had come to the United States in 1987. The couple had one child. On the night of Melissa's death, she and Xu had gotten into an argument over Melissa's lengthy long distance phone call to her father in China. Xu pushed Melissa on the shoulder, and she pushed him back. Shuang intervened, pushing Xu and scratching his face. While Shuang and Xu argued, Melissa passed out. Xu said Melissa had passed out before; and Shuang attempted to revive her by pinching her upper lip. When this did not work, Xu called his parents' home to find someone to watch their child while he took Melissa to the hospital. By the time Xu's parents, two sisters, brother-in-law, and another sister-in-law arrived, Xu had carried Melissa out to his sister's car. Xu said he told a police officer and the nurse at the hospital that Melissa had passed out during an argument. Xu described a medical condition Melissa had suffered from for some time and concluded that he did not "do anything to cause [his] wife's death." According to Holguin's notes, Xu held Melissa's picture and "cried a lot during the interview." Xu's first statement does not contain *Miranda* warnings.

Although the record does not establish whether Xu took any breaks during the interrogation, it implies he remained in the interview room the entire time, did not ask to terminate the interview or refuse to answer questions, and did not ask to see anyone. The record does establish that Detective Holguin, at some point, denied a request by Xu's friend to see him.

After making his first statement, Xu did not leave the station. Instead, at approximately 6 p.m., Detectives Evans and Escobar began a second interview. Unlike Holguin, Evans and Escobar did not tell Xu that he was not under arrest and was free to leave. Instead, Evans told Xu he had just spoken to the medical examiner, who had determined that Melissa had been strangled. Escobar added that Shuang had already told them what had happened. In fact, she had not. When confronted in

this manner, Xu became very emotional; it took almost twenty minutes to calm him down. At approximately 6:55 p.m., Xu signed his second statement. Like Xu's first statement, this statement was written by the detective, with changes made in broken English by Xu.[1] Also like the first statement, this one did not contain *Miranda* warnings.

In his second statement, Xu states that Evans told him Melissa had been strangled and asked if Shuang had done it. Xu replied that Shuang had nothing to do with it. Evans responded that Melissa had to have been strangled either by Xu or Shuang, since they were the only two other adults in the house at the time. Xu's second statement continued:

> At some point I got really mad and I grabbed her by the throat. I was so mad I don't know how hard I squeezed. She fell to the floor and me and her sister tried to start waking her up. She wouldn't get up and she was turning ~~blue~~ white. I didn't mean to kill her and this was an accident. I was just upset over something stupid and I really love her very much. I can't believe she is dead.

Evans testified that after Xu signed his second statement, an arrest warrant could have been easily obtained; but it was not. Evans agreed that if he had arrested Xu after he gave his second statement, he would have had a "problem with the custodial interrogation"—Xu's "statements [would] come in if [they] let him go home"; "[i]f they don't let him go home, these statements may not come in."

As Evans, Escobar, and Xu were leaving the interview room, Xu "threw himself to the floor, began screaming and crying and hitting his head on the floor and saying that he wanted [the detectives] to kill him, that he did not deserve to live, he wanted [the detectives] to beat him and shoot him." At this point, one of the detectives informed Xu's friends and relatives that Xu had admitted killing his wife. Xu left the police station at 7:00 or 8:00 p.m. on January 6. On January 8, he was arrested and charged with the murder of Melissa Wang.

Before trial, Xu moved to suppress both his first and second statements, because they were not voluntarily made but were instead the result of the coercion and intimidation resulting from the multiple interviews by multiple officers, the small interview room, the refusal to permit Xu's friend into the interview room, Xu's difficulties with the English language, the lack of an interpreter, and the failure to give Xu *Miranda* warnings either orally or on the face of the statements. After hearing the evidence set forth above, the trial court admitted both statements, finding on the record that they were voluntarily made and were not the product of custodial interrogation.

### CUSTODIAL INTERROGATION

█ Xu argues the trial court erred in denying his motion to suppress his second statement because it was taken in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and article I, section 10 of the Texas Constitution; and it is inadmissible under

---

1. For example, Xu interlineated his first statement with the following sentence: "I told her was over 30 minutes already. She got upset. Said you care you family. I said not true." Similarly, Xu corrected a portion of his second statement as follows:

> We started arguing about her father and my father ~~and how my father was going to give me the restaurant someday.~~ I take care restaurant I need give my family money.

articles 38.22 and 38.23 of the Texas Code of Criminal Procedure. We agree.

A written statement made by an accused as a result of custodial interrogation is inadmissible unless it is shown on the face of the statement that (1) before making the statement, the accused received specific warnings from a magistrate or the person to whom the statement is made and (2) the accused knowingly, intelligently, and voluntarily waived the rights set out in the warnings. TEX.CRIM. PROC.CODE ANN. art. 38.22, § 2 (Vernon 1979); *see Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). It is undisputed that Xu's second statement does not show on its face that he received the required warnings from Evans or Escobar. It is likewise undisputed that Xu did not waive his rights. Therefore, the admissibility of Xu's second written statement rests upon whether the interview leading up to his second statement was a custodial interrogation.

■ Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. The Texas Court of Criminal Appeals has "outlined at least four general situations which may constitute custody." *Dowthitt v. State,* 931 S.W.2d 244, 255 (Tex.Crim. App.1996). We are concerned here with the fourth: "when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave." *Id.* "Concerning the fourth situation, *Stansbury*[2] dictates that the officers' knowledge of probable cause be manifested to the suspect." *Id.* "Such manifestation could occur if information substantiating probable cause is related

by the officers to the suspect or by the suspect to the officers." *Id.* However, "situation four does not automatically establish custody; rather, custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest." *Id.*

■ It is clear that an interrogation is not custodial when a person voluntarily accompanies the police to the station, undergoes a thirty-minute interview, and leaves—regardless of whether the person is informed that he is not under arrest. *See id.* (citing *California v. Beheler,* 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) and *Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)). Similarly, an interrogation is not custodial when a suspect arrives at the station "voluntarily at a time of his choosing, [is] allowed to step outside the building and go unaccompanied to his car during the interviews [that lasted several hours], and [is] allowed to leave unhindered after the statements [are] taken." *Dowthitt,* 931 S.W.2d at 255 (citing *Meek v. State,* 790 S.W.2d 618 (Tex.Crim.App.1990)). Thus, the factors we must consider in determining when custody attaches include whether the suspect arrived at the place of interrogation voluntarily, the length of the interrogation, whether the suspect's requests to see relatives and friends are refused, and the degree of control exercised over the suspect. *See Dowthitt,* 931 S.W.2d at 255–57. Finally, we must look at whether a "pivotal admission established custody," as in *Ruth v. State,* 645 S.W.2d 432 (Tex. Crim.App.1979). *Dowthitt,* 931 S.W.2d at 256; *see Ruth,* 645 S.W.2d at 436 (suspect's "statement that he had shot the victim immediately focused the investiga-

**2.** *Stansbury v. California,* 511 U.S. 318, 324–   25, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994).

tion on him and furnished probable cause to believe that he had committed an offense; [a]fter that time, the continued interrogation must be considered a custodial one").

### Probable Cause

Before the second interview began, Evans confronted Xu with the medical examiner's determination that Melissa was strangled, his disbelief in Xu's previous statement, and that Shuang had supposedly told him what had really happened. The cumulative effect of these statements would certainly convey to a reasonable person that the investigation had now focused on him. It would also affect his perception of whether he was free to leave. And it was shortly after these statements were made—necessarily less than forty minutes—that Xu made his "pivotal admission"—that he had grabbed his wife by the throat. Given Evans' statement to Xu that the medical examiner had determined that Melissa had been strangled, we have no doubt that a reasonable person would have realized the incriminating nature of such an admission. Nor do we have any doubt that, at least by the time Xu made this "pivotal admission," probable cause for an arrest had been established. Certainly, the police had no such doubt. As Evans testified, after Xu signed his second statement, he could have easily obtained an arrest warrant. Therefore, we must determine whether this "manifestation of probable cause, combined with other [objective] circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest." *Dowthitt*, 931 S.W.2d at 255.

### Other Objective Circumstances

And what are the other objective circumstances? Xu voluntarily submitted to interrogation at the police station. But, first and foremost, we believe, is Xu's emotional and physical state. His wife had died—whether by his hand or though some medical condition—approximately eighteen hours before the second interview began; and Evans' statements at the beginning of the second interview strongly indicated that he believed Xu had murdered her. After being confronted in this manner, Xu was so distraught, it took almost twenty minutes to calm him down. Also to be considered is that Xu was born and had spent most of his life in China, a country in which there are no *Miranda* warnings.[3] Moreover, he had only a limited command of the English language, as demonstrated by his corrections to both statements.

We must also look at the circumstances surrounding the second interview. By the time it began, Xu had been at the police station approximately five hours, during which time he was intermittently crying and clutching Melissa's picture. Significantly, when Evans confronted Xu at the beginning of the second interview, it had been approximately eighteen hours since Xu had received *Miranda* warnings at the hospital and five hours since Xu had been told by Holguin that he was free to leave the police station—a statement that was not reiterated after Evans told Xu Melissa had been strangled or after Xu's "pivotal admission" or at any other point during the second interview.[4] During this five or six-hour time span, the record reflects Xu was given only one bottle of water and

---

3. *See* Ronnie Littlejohn, *Criminal Law in China* (available on the internet at http://www.belmont.edu/ philosophy/courses/CMCandCriminalLaw.html).

4. Although the detectives testified that if Xu had asked, he would have been free to leave, their subjective intentions are not relevant if not manifested. *See Stansbury*, 511 U.S. at 324–25, 114 S.Ct. 1526.

perhaps one restroom break. Although the record does not reflect the extent of police control over Xu during this time, it does establish that Xu's friend was not permitted to see or speak with Xu.

Given the objective circumstances surrounding the second interview, coupled with Xu's "pivotal admission" that established probable cause for an arrest, we hold that Xu was in custody from the moment he made his "pivotal admission," even though he was not formally arrested until some time later. Indeed, the fact that Xu was permitted to leave the station and was not formally arrested until some time later does not appear to have been because he was not in custody after his "pivotal admission," but, as Evans testified, because the police believed they would have had a "problem with the custodial interrogation." Xu's "statements [would] come in if [they] let him go home"; "[i]f they don't let him go home, these statements may not come in."

Because Xu's second statement was the result of custodial interrogation and not made in compliance with *Miranda* or article 38.22, we hold the trial court erred in denying Xu's motion to suppress and admitting his second statement.

### *Harm*

Because the error in this case violated Xu's federal constitutional rights, we employ the constitutional error standard for harm. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.; see* Tex.R.App. P. 44.2(a). This standard takes into consideration both the quality of the evidence and whether "the question of guilt or innocence is a close one." *See Chapman,* 386 U.S. at 22, 87 S.Ct. 824.

Because the State's theory of this case was that Xu strangled his wife during an argument, the State based its case on the medical examiner's determination that Melissa was strangled and Xu's admission that he had grabbed Melissa's throat during their argument. Xu attacked the State's case in two principal ways. First, Xu challenged the State's factual predicate; Xu and Shuang testified that, although Xu and Melissa had argued, he did not strangle his wife. Second, Xu attacked the State's medical testimony, both on cross-examination of the State's medical examiner by eliciting evidence of the limited experience (particularly with strangulation) of the ME who had performed the autopsy and on direct examination of Xu's expert witness, Dr. Michael Baden, the former chief medical examiner of New York City, as well as the current co-director of the medical/legal investigation unit of the New York State Police and the chief forensic pathologist for the New York State Police and Dutchess County, New York. Baden has personally performed or supervised the autopsy in many hundreds of strangulation cases.

According to Baden, because "homicidal strangulation is—can be a very difficult diagnosis to make," he conducted a full investigation of Melissa's death—speaking with Xu and Shuang, of course, but also reviewing Melissa's medical history, including the records of the hospital at which she died. In these records, Baden found it significant that "there was a specific note that when she entered the hospital there was no injury to her head or neck area on admission." Ultimately, approximately two weeks after Melissa's death, Dr. Baden performed a second autopsy. As a result of his investigation, Baden concurred with Melissa's treating physician at

the hospital: Melissa died not of strangulation but of cardiac arrhythmia. Hence, the State remarked during closing arguments: "If ... you heard the different experts ... disagree and I didn't have a confession, you might have some doubt."

It thus cannot be doubted that the State considered Xu's admission that he grabbed Melissa's throat during their argument to be a critical piece of evidence. However, on appeal, the State argues the admission into evidence of Xu's second written statement was rendered harmless by the unobjected-to admission of the same evidence in testimonial form through Evans. As a general rule, we might well agree. *See, e.g., United States v. Robinson,* 20 F.3d 320, 323 (8th Cir.1994) ("Because Robinson's written statement was admissible under [*Oregon v.*] *Elstad* [470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985)], any error in admitting his initial oral admission was harmless beyond a reasonable doubt."). But we are unable to do so on this record.

■ First, we do not agree that Xu failed to object to Evans' testimony entirely. He did not object to Evans' testimony at trial, but Xu's pretrial motion to suppress sought to suppress all of Xu's statements; it is thus broad enough to encompass Xu's oral statement embedded within Evans' testimony. Having objected before trial unsuccessfully, Xu was not required to repeat his objection at trial. *Cf., e.g., Moraguez v. State,* 701 S.W.2d 902, 904 (Tex.Crim.App.1986) (holding that defendant whose pretrial motion to suppress is denied need not object at trial to same evidence to preserve error). Second, and most important, *Chapman* instructs us that the constitutional error standard is designed to take into account not only the quality of the erroneously admitted evidence but also whether the jury confronted a close case on guilt or innocence. We believe both factors weigh heavily in favor of finding harm in this unusual case.

The erroneously admitted signed and sworn written statement was without doubt "highly important and persuasive" evidence. *Chapman,* 386 U.S. at 22, 87 S.Ct. 824. The only other evidence that Xu "grabbed" Melissa's throat is Evans' testimony about what Xu said, which was and would be again subject to extensive cross-examination not only on Evans' credibility but also on Evans' interpretation and characterization of Xu's oral statement, particularly in light of the conflict between Evans' testimony and the note in the hospital's records that when Melissa was admitted to the hospital "there was no injury to her head or neck area." Moreover, this note, coupled with the inexperience of the ME in strangulation cases and Baden's outstanding credentials and unequivocal testimony, presented the jury with a very close case on guilt or innocence.

Given all these factors, we simply cannot conclude beyond a reasonable doubt that the erroneous admission of Xu's second statement did not contribute to his conviction. We therefore hold the erroneous admission of Xu's second statement was harmful error.

### CONCLUSION

Because the erroneous admission into evidence of Xu's second statement was harmful error, we reverse the trial court's judgment and remand the cause to the trial court for a new trial consistent with this opinion.