**Zhi Jun XU a/k/a Frank Xu, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 04–04–00449–CR.**

Court of Appeals of Texas, San Antonio.

Dec. 7, 2005.

Rehearing Overruled Feb. 13, 2006.

Robert O. Switzer, San Antonio, for appellant.

Enrico B. Valdez, Asst. Crim. Dist. Atty., San Antonio, for appellee.

Sitting: ALMA L. LÓPEZ, Chief Justice, CATHERINE STONE, Justice, PHYLIS J. SPEEDLIN, Justice.

## OPINION

Opinion by PHYLIS J. SPEEDLIN, Justice.

Frank Xu appeals his conviction for the murder of Melissa Wang, his wife. Because we hold the trial court committed harmful error in denying Xu's motion to suppress his oral statement, we reverse the trial court's judgment and remand the cause for a new trial consistent with this opinion.

### FACTUAL AND PROCEDURAL BACKGROUND

The instant appeal arises out of the second murder conviction of Frank Xu. In his first trial, he was convicted of murdering his wife by strangulation and sentenced to 25 years imprisonment. This court overturned that conviction after determining the trial court erred in denying Xu's motion to suppress his second written statement, which was the product of custodial interrogation without *Miranda*[1] warnings or compliance with Article 38.22 of the Texas Code of Criminal Procedure. TEX. CODE CRIM. PROC. ANN. art. 38.22 (Vernon 2004); see *Xu v. State*, 100 S.W.3d 408, 415 (Tex.App.-San Antonio 2002, pet. ref'd). Xu was retried and again convicted of murder, but sentenced to nine years imprisonment. Xu now appeals his second conviction arguing, among other things, that the trial court erred in denying his motion to suppress his oral statement made shortly after the second written statement was signed. Because substantially the same evidence was presented at Xu's second trial, and because the background facts set forth in our original opinion are relevant to the issue before us today, we restate them in full below:

Shortly after midnight on January 6, 1999, Xu's wife, Melissa Wang, died. Unconscious and with a bluish skin tone, Melissa had been brought by her family to the emergency room. Cardiopulmonary resuscitation and intubation were performed but proved unavailing. Whenever there is a death at the hospital, San Antonio police are called. Officer Piotrowski read Xu his *Miranda* rights and then interviewed him regarding the circumstances of Melissa's death, which Xu attributed to a seizure. Detective Giddings also conducted a brief inquiry at Xu's home; in his 4:00 a.m. report, he concluded there was no sign of a struggle. Dr. Hersh, Melissa's attending physician, concluded Melissa's death had been caused either by cardiac arrhythmia or an aneurysm.

Sometime during the morning of January 6, the medical examiner determined the cause of Melissa's death was strangulation. Accordingly, at 10:55 a.m. on January 6, an investigation into Melissa's death was opened and assigned to Detective Holguin. Holguin reviewed the file, which consisted in major part of Piotrowski's and Giddings' "apparent sudden death" reports. After Holguin's partner, Detective Escobar, told Holguin that the medical examiner had concluded the cause of Melissa's death was strangulation, Holguin changed the offense classification in the previous reports to strangulation. At noon, Holguin called Xu and asked him to meet him at Xu's home. Xu agreed to do so.

When Holguin and Escobar first arrived at Xu's home, Holguin asked Xu to

---

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

sign a consent to search form. Xu complied. Holguin next asked Xu to show him where Melissa collapsed. Again, Xu complied. Neither Holguin nor the four or five evidence technicians who searched the house during the remainder of the afternoon found evidence of a struggle or any other evidence that Melissa had been strangled. After twenty or thirty minutes, Holguin asked Xu and Melissa's sister, Shuang, to come to the police station for interviews. Xu and Shuang agreed; and, at approximately 1:00 p.m., a friend of Xu's drove Xu, his brother, and Shuang to the police station.

Upon arriving at the station, Xu and Shuang were placed in separate rooms. Initially, Xu completed a personal information form. Then, after providing Xu with a bottle of water, Detective Holguin began to interrogate Xu. At 1:56 p.m., Holguin began typing Xu's first statement. At 3:35 p.m., it was signed by Xu. In his first statement, Xu states he had been informed he was not under arrest and was free to leave. Holguin testified he did not give Xu his *Miranda* rights either at Xu's home or later at the police station, because he did not believe either interview was a custodial interrogation.

According to Xu in his first statement, he and Melissa had known each other since they were children in China, had been married approximately seven years, and had come to the United States in 1987. The couple had one child. On the night of Melissa's death, she and Xu had gotten into an argument over Melissa's lengthy long distance phone call to her father in China. Xu pushed Melissa on the shoulder, and she pushed him back. Shuang intervened, pushing Xu and scratching his face. While Shuang and Xu argued, Melissa passed out. Xu said Melissa had passed out before; and Shuang attempted to revive her by pinching her upper lip. When this did not work, Xu called his parents' home to find someone to watch their child while he took Melissa to the hospital. By the time Xu's parents, two sisters, brother-in-law, and another sister-in-law arrived, Xu had carried Melissa out to his sister's car. Xu said he told a police officer and the nurse at the hospital that Melissa had passed out during an argument. Xu described a medical condition Melissa had suffered from for some time and concluded that he did not "do anything to cause [his] wife's death." According to Holguin's notes, Xu held Melissa's picture and "cried a lot during the interview." Xu's first statement does not contain *Miranda* warnings.

Although the record does not establish whether Xu took any breaks during the interrogation, it implies he remained in the interview room the entire time, did not ask to terminate the interview or refuse to answer questions, and did not ask to see anyone. The record does establish that Detective Holguin, at some point, denied a request by Xu's friend to see him.

After making his first statement, Xu did not leave the station. Instead, at approximately 6 p.m., Detectives Evans and Escobar began a second interview. Unlike Holguin, Evans and Escobar did not tell Xu that he was not under arrest and was free to leave. Instead, Evans told Xu he had just spoken to the medical examiner, who had determined that Melissa had been strangled. Escobar added that Shuang had already told them what had happened. In fact, she had not. When confronted in this manner, Xu became very emotional; it took almost twenty minutes to calm him down. At approximately 6:55 p.m., Xu signed his second statement. Like Xu's

first statement, this statement was written by the detective, with changes made in broken English by Xu.[2] Also like the first statement, this one did not contain *Miranda* warnings.

In his second statement, Xu states that Evans told him Melissa had been strangled and asked if Shuang had done it. Xu replied that Shuang had nothing to do with it. Evans responded that Melissa had to have been strangled either by Xu or Shuang, since they were the only two other adults in the house at the time. Xu's second statement continued:

> At some point I got really mad and I grabbed her by the throat. I was so mad I don't know how hard I squeezed. She fell to the floor and me and her sister tried to start waking her up. She wouldn't get up and she was turning ~~blue~~ white. I didn't mean to kill her and this was an accident. I was just upset over something stupid and I really love her very much. I can't believe she is dead.

Evans testified that after Xu signed his second statement, an arrest warrant could have been easily obtained; but it was not. Evans agreed that if he had arrested Xu after he gave his second statement, he would have had a "problem with the custodial interrogation"— Xu's "statements [would] come in if [they] let him go home"; "[i]f they don't let him go home, these statements may not come in."

As Evans, Escobar, and Xu were leaving the interview room, Xu "threw himself to the floor, began screaming and crying and hitting his head on the floor

and saying that he wanted [the detectives] to kill him, that he did not deserve to live, he wanted [the detectives] to beat him and shoot him." At this point, one of the detectives informed Xu's friends and relatives that Xu had admitted killing his wife. Xu left the police station at 7:00 or 8:00 p.m. on January 6. On January 8, he was arrested and charged with the murder of Melissa Wang.

*Xu,* 100 S.W.3d at 410–12.

Before his second trial, Xu moved to suppress the oral statement arguing it was made contemporaneously with the second written statement and should thus be excluded for the same reasons. A hearing was held, in which both sides argued but did not call any witnesses. The court deferred its ruling until the third day of trial, at which time it held another hearing outside the presence of the jury. The trial court ruled the oral statement admissible, finding on the record that the statement was not the result of custodial interrogation but was voluntarily made by Xu as Evans and Escobar were on their way out of the interview room.

### ANALYSIS

In his first issue, Xu argues that the court erred in overruling his motion to suppress his oral statement in which he threw himself to the floor and screamed "beat me, kill me, I don't want to live for what I've done." He claims that the trial court erred by admitting the oral statement because it was made at the same time as the written statement and was a continuation of a custodial interrogation

---

**2.** For example, Xu interlineated his first statement with the following sentence: "I told her was over 30 minutes already. She got upset. Said you care you family. I said not true." Similarly, Xu corrected a portion of his second statement as follows:

> We started arguing about her father and my father ~~and how my father was going to give me the restaurant someday.~~ I take care restaurant I need give my family money.

without *Miranda* warnings, in violation of his federal and state constitutional rights and Articles 38.22 and 38.23 of the Texas Code of Criminal Procedure. TEX.CODE CRIM. PROC. ANN. arts. 38.22, 38.23 (Vernon 2004). The State contends that the statement was not a result of interrogation, and was properly admitted because the preceding interrogation, which resulted in the inadmissible written statement, had ended before the oral statement was given.

### Standard of Review

We review a trial court's suppression ruling under the abuse of discretion standard. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App.1997). Under this standard, we afford almost total deference to a trial court's determination of historical facts supported by the record, especially when the findings are based on an evaluation of credibility and demeanor. *Id.* However, the trial court's resolution of mixed questions of law and fact, which does not turn on an evaluation of credibility and demeanor, is reviewed *de novo. Id.* On this record, the factual circumstances under which Xu's oral statement was made are undisputed. Accordingly, the trial court's ruling that Xu's oral statement was not a product of custodial interrogation does not turn on an evaluation of credibility and demeanor, and must be reviewed *de novo. See id.*

### Custodial Interrogation

We begin our analysis by determining whether Xu was being interrogated at the time of his oral statement. The *Miranda* court defined custodial interrogation as questioning that is "initiated by law enforcement officers after a person

has been taken into custody or otherwise deprived of his freedom of action in any significant way."[3] *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602; *Cannon v. State*, 691 S.W.2d 664, 671 (Tex.Crim.App.1985). A person may be interrogated either through express questioning or its functional equivalent. *Rhode Island v. Innis*, 446 U.S. 291, 300–301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Jones v. State*, 795 S.W.2d 171, 174 (Tex.Crim.App.1990); *Wiley v. State*, 699 S.W.2d 637, 638 (Tex. App.-San Antonio 1985, pet. ref'd). Interrogation includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301, 100 S.Ct. 1682. A determination of whether or not an interrogation occurred focuses on the perceptions of the suspect, not the intent of police. *Id.* However, the police cannot be held responsible for the unforeseen results of their actions and words. *Id.* at 301–02, 100 S.Ct. 1682. Thus, interrogation can only extend to words and actions of police officers that they "should have known" would likely elicit an incriminating response. *Id.* at 302, 100 S.Ct. 1682. When determining what the police "should have known" was likely to elicit an incriminating response, police knowledge of a defendant's unusual susceptibility to a particular form of persuasion may be an important factor. *Id.* at 302, 100 S.Ct. 1682 n. 8. But where there is only a simple failure to warn a defendant, without actual coercion or other circumstances that would not allow one to exercise his free will, the investigatory process is not so tainted as to make a

---

3. In Xu's first appeal, this court held that at the time his second written statement was made, Xu was in custody. *Xu*, 100 S.W.3d at 415. It is undisputed that Xu did not leave the interview room after his second written

statement and before his oral statement. Consequently, we need not revisit whether Xu was in custody at the time of his oral statement.

subsequent voluntary and informed waiver invalid. *Oregon v. Elstad*, 470 U.S. 298, 309, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

Xu claims that the interrogation producing the inadmissible written statement was continuous and resulted in his oral statement, which should also be inadmissible. He relies on *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). In *Seibert*, the police arrested a suspect; deliberately interrogated her without the recitation of *Miranda* warnings; she confessed; she was given a 20 minute coffee and cigarette break; *Miranda* warnings were then given to her; and she gave another confession. *Id.* at 604–05, 124 S.Ct. 2601. The Supreme Court in *Seibert* held that a midstream recitation of *Miranda* warnings after interrogation and an unwarned confession did not effectively comply with *Miranda's* constitutional requirements. *Id.* at 605, 124 S.Ct. 2601. The Court reasoned that because the successive interrogation producing the second statement was "close in time and similar in content" to the first unwarned statement, the second statement made after *Miranda* warnings were given should also be suppressed. *Id.* at 613, 124 S.Ct. 2601. Specifically, the Court considered several factors to determine whether *Miranda* was satisfied, including: the completeness and detail of the questions and answers in the first unwarned interrogation; the overlapping content of the two statements; the timing and setting of the first and second statements; the continuity of police personnel; and the degree to which the interrogator's questions treated the second round as continuous with the first. *Id.* at 615, 124 S.Ct. 2601. Applying these factors, the Court found the second statement failed to comply with *Miranda* and was inadmissible. *Id.* at 617, 124 S.Ct. 2601.

Applying the *Seibert* factors to the instant case, we conclude Xu's second written statement and his oral statement are "close in time and similar in content." *Id.* at 615, 124 S.Ct. 2601. The questioning leading to Xu's confession was complete and detailed enough to produce a written statement in which he admitted strangling Melissa and laid out specific details of her death and the surrounding events. Also, the subject matter of both statements was substantially the same—Xu's admission of guilt. In addition, Detective Evans testified at both the first and second trial that only 15 minutes passed between the end of questioning and Xu's oral statement. During that 15 minutes, Evans remained in the interrogation room with Xu to type and correct the written statement. Evans gave the statement to Xu for review and asked him to read the first paragraph aloud to ensure he could read and understand the statement in English. Then he asked Xu to read the remainder to himself and to make changes as Xu saw fit. Evans asked Xu if he swore to the truth of the statement and then asked Xu to sign the statement, which Xu did immediately before making his oral statement. From the perspective of Xu, this entire exchange, including the interrogation, typing, confirming the correctness of the statement, and swearing to the statement, would reasonably be considered a continuous event. Additionally, the same detectives, Evans and Escobar, were in the room for both statements. The time that expired between the signing of the second written statement and the oral statement was inconsequential—merely the amount of time taken for the detectives to rise from their chairs after the written statement was signed and turn to leave the room.

Xu also argues that if the second statement in *Seibert* is inadmissible after *Miranda* warnings were administered, cer-

tainly in his case, where no *Miranda* warnings were ever given,[4] his oral statement should not be admissible. We agree. *Miranda* warnings were *never* given to Xu at the police station, even though he was there for approximately five hours. From Xu's perspective, the same circumstances and influences which produced the inadmissible written statement also produced the oral statement, even though he was not being directly questioned at the time of the oral statement. Additionally, the officers should have known their interrogation would result in Xu's oral statement. *Innis,* 446 U.S. at 301, 100 S.Ct. 1682 (whether or not one is interrogated is determined from the perspective of the suspect and may be assessed by what the officers "should have known" regarding the mental state of the suspect). The detectives described Xu as emotional and upset throughout the day. He was described as "hysterical." He repeatedly wept and clutched a picture of his wife and daughter. The detectives knew Xu's English was broken and that he came from China, where the culture is far different than that of the United States. Based on the totality of these circumstances, we hold that Xu's oral confession was made as a result of, and in continuation of, the improper custodial interrogation.

We distinguish our holding today from our recent decision in *Villarreal v. State,* in which we upheld admission of an oral statement made while a defendant was in custody. *Villarreal v. State,* No. 04–05–00287–CR, 2005 WL 2989526, at *2 (Tex. App.-San Antonio Nov.9, 2005, no pet. h.)(not designated for publication). In that case, the defendant was given his *Miranda* warnings and questioned, but denied involvement in the case; he was subsequent-

ly arrested. *Id.* at 1. Almost 11 hours after his arrest, the defendant requested to speak with the police chief. The chief came to the jail, repeated the *Miranda* warnings, verbally confirmed that the defendant wanted to waive his rights, and proceeded to take the defendant to an interview room. *Id.* On the way to the interview room, however, the chief stopped at the booking desk to obtain a *Miranda* waiver form, and at that moment, without being questioned, the defendant orally confessed to killing his mother. *Id.* He subsequently signed the waiver and made a written confession. Both the oral and written confessions were admitted into evidence at trial. *Id.*

*Villarreal* is factually distinguishable from Xu's case. The critical differences are that Villarreal received *Miranda* warnings before he made the oral statement and the oral statement did not immediately follow an interrogation, but actually preceded the interrogation. Moreover, Villarreal expressed his desire to make a voluntary statement to the police chief. Although he voluntarily complied, Xu was asked to come to the police station and was subsequently questioned by Holguin, and then Evans and Escobar, for approximately five hours immediately before making the written and oral statements. In addition, in *Villarreal,* the defendant orally waived his rights immediately before he made the incriminating statement. Xu never indicated an intent to waive his rights. In *Villarreal,* the interrogation had ended 11 hours before the incriminating statement was made, whereas in Xu's case, the interrogation was still in progress within 15 minutes of the incriminating statement. We hold the admission of Xu's

---

4. The evidence was uncontroverted that Xu received *Miranda* warnings only at the hospital, before Xu was a suspect, and that the warnings were not repeated at the police sta-

tion during the interrogations. The interrogations occurred off and on all afternoon on January 6, 1999, beginning at about 2:00 p.m. and ending at approximately 7:00 p.m.

oral statement was error because it was the result of a continuing custodial interrogation that violated Xu's constitutional and statutory rights.

### Harm Analysis

■ We held in our prior *Xu* opinion that the admission of the written confession resulted in harmful error, and remanded the case for a new trial. *Xu,* 100 S.W.3d at 416. The second trial was substantially similar to the first, with the guilt/innocence phase again lasting approximately five days and with each party calling approximately the same witnesses. There were two significantly different witnesses at the second trial. In the second trial, Xu called Dr. Daren Hersh, the treating emergency room physician, who testified that he did not observe any injury to Melissa's head or neck area when she arrived at the emergency room. He did not testify in the first trial. Also, in the first trial, Xu called Dr. Michael Baden as an expert witness. Dr. Baden had performed a second autopsy about two weeks after Melissa's death and opined that her death was caused by cardiac arrhythmia, not strangulation. *Id.* at 415–16. He was unavailable during the second trial, and Dr. William Anderson was called in his stead. Like Dr. Baden, Dr. Anderson is a highly credentialed forensic pathologist. Dr. Anderson testified to his expert opinion that Melissa's cause of death could not be conclusively determined, but that the discoloration on her neck area was not a bruise but rather postmortem artifacts.

■ Despite these differences, the legal issues raised in both trials are the same. Under the "law of the case" doctrine, when addressing a legal question at issue in a previous appeal in the same case, the prior decision will govern the disposition of the same issue. *Ware v. State,* 736 S.W.2d 700, 701 (Tex.Crim.App. 1987). Thus, because we previously decided the same type of error violated Xu's federal constitutional rights, and employed the harm standard for constitutional error, we do so again here. *See Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Id.; see* Tex.R.App. P. 44.2(a). This standard takes into consideration whether "the question of guilt or innocence is a close one." *Chapman,* 386 U.S. at 22, 87 S.Ct. 824.

The State's theory of the case was that Xu strangled his wife during an argument. The State based its case on the medical examiner's determination that Melissa was strangled and on Xu's incriminating oral statement. Xu attacked the State's case in two principal ways. First, Xu challenged the State's factual predicate; Shuang testified that, although Xu and Melissa had argued, Xu did not strangle his wife. In addition, Shuang testified that she would never let Xu choke or strangle Melissa. Second, Xu attacked the State's medical evidence, through cross-examination of the medical examiner as to her limited experience (having only performed one prior manual strangulation autopsy), and on direct examination of Xu's own expert witness, Dr. Anderson, who contradicted the medical examiner's conclusion of strangulation. In light of the competing medical expert testimony, Xu's oral admission was a critical piece of evidence for the State. In fact, the State's closing argument began by quoting Xu's oral statement. Chapman instructs us that the constitutional error standard is designed to take into account whether the jury confronted a close case on guilt or innocence. *Chapman,* 386 U.S. at 22–23, 87 S.Ct. 824.

In our first opinion, we noted that the erroneously admitted written confession

was "highly important and persuasive" evidence. *Xu,* 100 S.W.3d at 416 (quoting *Chapman,* 386 U.S. at 22, 87 S.Ct. 824). We further noted that the only other substantial evidence of Xu's guilt was Evan's testimony about Xu's oral statement: "beat me, kill me, I don't want to live for what I've done." *Id.* We determined that the guilt/innocence decision was very close, even with the written, more specific, admission of guilt. *Id.* Without that written statement, and with only the less specific oral statement, there is no doubt that the jury in the second trial was presented with a very close case indeed. Given all these factors, we simply cannot conclude beyond a reasonable doubt that the erroneous admission of Xu's oral statement did not contribute to his conviction. *Chapman,* 386 U.S. at 24, 87 S.Ct. 824. Accordingly, we sustain Xu's first issue, and reverse the trial court's judgment and remand to the trial court for a new trial. Because we sustain the first issue, we need not decide the remaining issues raised by Xu.