**REVERSE and REMAND; and Opinion Filed June 6, 2013.**



**In The**

**Court of Appeals**

**Fifth District of Texas at Dallas**

**No. 05-11-01551-CR**

**THE STATE OF TEXAS, Appellant**

**V.**

**AUBREY MALENA, Appellee**

**On Appeal from the 203rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F09-20987-P**

## MEMORANDUM OPINION

Before Justices Moseley, O'Neill, and Lewis
Opinion by Justice O'Neill

Appellee Aubrey Malena was charged with capital murder. He filed a motion to suppress statements made during a police interview, which the trial court granted. In two issues, the State argues the trial court erred in suppressing the statements because appellee was not in custody; therefore, *Miranda* warnings were unnecessary and appellee's recorded statements were voluntary. We reverse the trial court's suppression order and remand to the trial court for further proceedings.

## Background

On August 25, 2009, Detective Ralph Woods was investigating a homicide. During the course of his investigation, Detective Woods learned that appellee had called one of the suspects several times on the day of the murder.

Detective Woods waited for appellee outside his house and when appellee returned, Detective Woods asked him if he would come back to the station to discuss the murder investigation. Detective Woods told appellee he was not under arrest but simply wanted to talk with him. He also told appellee's family members he was not under arrest and would bring him home. Appellee agreed and asked if he needed to be handcuffed. Detective Woods said no. Appellee then rode with officers in a squad car to the station. Upon arrival, Detective Woods reiterated appellee was at the station "on his own volition."

Detective Woods began the interview by asking why appellee had called the suspect, referred to as G-Tech. Appellee admitted to knowing G-Tech and discussing with him the possibility of trading cars. Detective Woods explained to appellee that G-Tech was the guy they wanted because they believed he "orchestrated the whole thing" and pulled appellee into it.

Approximately an hour and a half into the interview, appellee admitted he burned the SUV belonging to the victim. The burned car was recovered about a half mile from appellee's home. Detective Woods testified at the suppression hearing he did not Mirandize appellee at this point "[b]ecause at the time he was free to go . . . ." "At the stage of the game where he says he burned the car, I was still very willing to let him walk out the door . . . we wanted to know where he would go."

Detective Woods further stated they did not know at that time if appellee was the shooter, "but he was definitely someone we wanted to talk to." He admitted that when he went to appellee's house, he knew about the burned car but "the arson to us was a side issue." Although he believed that the person who burned the car knew something about the murder, he did not know if the arsonist was specifically involved in the shooting.

Approximately two and a half hours into the interview, an officer tested appellee's hands for gunshot residue. Appellee eventually admitted to shooting a gun on the night of the murder

and finally confessed to shooting the victim.  At this point, Detective Wood testified appellee was being detained.  Officers then took a short break and when Detective Woods returned, he read appellee his *Miranda* rights.  Appellee waived his rights approximately three and a half hours into the interview and continued to talk with officers about the shooting.

Detective Woods was the sole witness at the suppression hearing.  An audio recording of the encounter from the moment officers arrived at appellee's house through the entire four-hour long station interview is also in the record.  The court referenced the audio recording and stated it had "listened to that in its entirety and taken notes on it."  At the conclusion of the hearing, the trial court granted the motion to suppress in its entirety.  This State's appeal followed.

### Standard of Review

A trial court's ruling on a motion to suppress is reviewed for an abuse of discretion under a bifurcated standard.  *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).  As the reviewing court, we defer to the trial court's determination of facts but review its application of the law de novo.  *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000).  When, as here, the trial court does not make findings of fact, appellate courts view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact that supports its ruling as long as those findings are supported by the record.  *Id*.

We acknowledge that in this case, the trial court listened to the four-hour audio recording of Detective Woods' interview with appellee.  Courts have repeatedly held that the deferential standard of review applies to a trial court's determination of historical facts when that determination is based on a videotape recording admitted into evidence at a suppression hearing.  *See Montanez v. State*, 195 S.W.3d 101, 109 (Tex. Crim. App. 2006); *see also State v. Hummel*, No. 05-11-00833-CR, 2012 WL 3553383, at *3 (Tex. App.—Dallas Aug. 17, 2012, pet. ref'd)

(not designated for publication). We see no reason why the same deferential standard should not likewise apply to an audiotape recording admitted into evidence at a suppression hearing.

Finally, a trial judge's ultimate custody determination presents a mixed question of law and fact. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007). Therefore, we afford almost total deference to the trial judge's custody determination when the questions of historical fact turn on credibility and demeanor. *Id.* at 527. With these standards in mind, we shall review the implied facts supported by the record and the law as it applies to custody.

### Custody

A person is in "custody" only if, under the circumstances, a reasonable person would believe his freedom of movement was restrained to the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 322 (1994); *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996). The "reasonable person" standard presupposes an innocent person. *Dowthitt*, 931 S.W.2d at 254. The subjective intent of an officer to arrest is irrelevant unless that intent is somehow communicated or otherwise manifested to the suspect. *Stansbury*, 511 U.S. at 322.

The determination of custody must be made on an ad hoc basis, after considering all of the objective circumstances. *Dowthitt*, 931 S.W.2d at 255. Stationhouse questioning does not, in and of itself, constitute custodial questioning. *Id*. However, the mere fact that an interrogation begins as noncustodial does not prevent custody from arising later, as police conduct during the encounter may cause a consensual inquiry to escalate into custodial interrogation. *Id*.

Four general situations may constitute custody: (1) when the suspect is physically deprived of his freedom in any significant way, (2) when a law enforcement officer tells the suspect he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe his freedom of movement has been significantly restricted, and (4)

when there is probable cause to arrest and law enforcement officers do not tell the suspect he is free to leave. *Id.* (citing *Shiflet v. State*, 732 S.W.2d 622, 629 (Tex. Crim. App. 1985)).

Concerning the first through third situations, the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention. *Id.* Concerning the fourth situation, the officers' knowledge of probable cause must be manifested to the suspect, which could occur if information substantiating probable cause is related by the officers to the suspect or by the suspect to the officers. *Id.*

The State argues the trial court erred in granting the motion to suppress because appellee was not in custody at the time he admitted shooting the victim; therefore, no *Miranda* violation occurred requiring suppression of his statements. Appellee responds he was not free to leave the interview and "there was such a restriction on his personal freedom as to render him 'in custody.'" He further argues *Martinez v. State*, 272 S.W.3d 615 (Tex. Crim. App. 2008), which disfavors the two-step interrogation technique concerning midstream confessions used to undermine *Miranda*, applies to his statements.

A review of the suppression hearing and the audiotape recording of appellee's interview establish that when Detective Woods first approached appellee at his house, he told appellee he was not under arrest. Appellee agreed to ride with detectives to the police station to answer questions about the murder investigation. When appellee asked if he needed to be handcuffed, Detective Woods said no. Detective Woods also told appellee's family he would bring him home. Upon arriving at the station, Detective Woods again said appellee was there on his own volition.

Appellee willingly gave his cell phone to Detective Woods to look at and after Detective Woods finished reviewing its history, he returned the cell phone to appellee. Several times during the interview detectives left the room to receive new information from other officers.

Appellee never requested to leave, to use his phone, or to talk to any friend or family member during this time. Despite his claim that "there was such a restriction on his personal freedom" to render him "in custody," he fails to cite to any specific conduct by Detective Woods, or any other officer, that establishes a reasonable person would believe his freedom of movement had been significantly restricted. Therefore, the record does not support any implicit finding by the trial court that appellee was physically deprived of his freedom in any way, or that detectives told appellee he could not leave, or that detectives created a situation in which appellee would believe his freedom of movement was significantly restricted. Thus, we are left with considering the fourth general situation of custody, whether there was probable cause to arrest appellee. *See Dowthitt*, 931 S.W.2d at 254.

When interpreting the fourth situation to establish custody, the officer's knowledge of probable cause must be manifested to the suspect, and such information could occur if information is related by the officer to the suspect or by the suspect to the officer. *Id.* at 255. However, the manifestation of probable cause does not automatically establish custody. Rather, custody attaches if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest. *Id.*

Situations where the manifestation of probable cause triggers custody are unusual. *State v. Stevenson*, 958 S.W.2d 824, 829 n.7 (Tex. Crim. App. 1997) (en banc); *Hodson v. State*, 350 S.W.3d 169, 174 (Tex. App.—San Antonio 2011, pet. ref'd). Courts often compare the facts in *Dowthitt* when determining if probable cause triggers custody. *See, e.g.*, *Hodson*, 350 S.W.3d at 174; *Garcia v. State*, 237 S.W.3d 833, 837 (Tex. App.—Amarillo 2007, no pet.); *Xu v. State*, 100 S.W.3d 408, 413–414 (Tex. App.—San Antonio 2002, pet. ref'd). In *Dowthitt*, the court determined the defendant was in custody after he admitted to being present during a murder

because "a reasonable person would have realized the incriminating nature of the admission." *Dowthitt*, 931 S.W.2d at 257. But in addition to the incriminating statement, the court noted the interrogation lasted approximately twelve hours before he made the incriminating statement, and officers exercised control over him by accompanying him on restroom breaks and denying repeated requests to see his wife. *Id*.

Here, approximately an hour and a half into the interview appellee admitted to burning the victim's SUV. While this statement implicated appellee committed a crime, "unless the circumstances are unique, as in *Dowthitt*, 'this alone does not trigger custody.'" *Hodson*, 350 S.W.3d at 174 (citing *Garcia*, 237 S.W.3d at 837). After appellee's admission, Detective Woods did not indicate to appellee that he had probable cause to arrest him. On the contrary, Detective Woods continued to emphasize that "G-Tech is the one I want." Thus, other than appellee's admission of burning a car, there were no other circumstances present to lead a reasonable person to believe he was in custody.

Because the undisputed facts show appellee voluntarily went to the station for questioning, he was not handcuffed at any time, Detective Woods told appellee's family he was not under arrest and would bring him home, the length of the interview was not unreasonable, and nothing in the record indicates officers used any force or tactics to restrain his freedom, the only basis for the trial court to determine Detective Woods should have given *Miranda* warnings was if the trial court believed the stationhouse interview turned into a custodial interrogation when appellee admitted to burning the victim's SUV. Essentially, the trial court disbelieved Detective Woods' testimony during the suppression hearing that he did not Mirandize appellee at this point "[b]ecause at the time he was free to go . . . ." "At the stage of the game where he says he burned the car, I was still very willing to let him walk out the door . . . we wanted to know where he would go." While the trial court was free to disbelieve Detective Woods, nothing else

within the record supports the implicit finding of custody. The trial court's disbelief of an officer's statement that a defendant is not in custody is not enough to establish custody when, under these facts, there is a complete absence of any other evidence to support custody.

Accordingly, we conclude the trial court's implicit finding that appellee was entitled to *Miranda* warnings after he admitted burning the victim's SUV is not supported by the totality of the circumstances on the record before us. Therefore, we hold the trial court abused its discretion in granting appellee's motion to suppress.

In reaching this conclusion, we need not address appellee's arguments regarding the application of *Martinez v. State*, 272 S.W.3d 615 (Tex. Crim. App. 2008), which disfavors the two-step interrogation technique concerning midstream confessions used to undermine *Miranda*. In that case, it was undisputed the defendant was in custody when he made an incriminating confession before he received *Miranda* warnings. *Id*. at 618. Thus, *Martinez* is inapplicable. Accordingly, we sustain the State's first issue.

**Voluntariness of Statement**

In its second issue, the State argues appellee's recorded statement was voluntary. Based on our analysis above, we agree. Appellee went to the police station of his own volition, and while not in custody, he admitted shooting the victim. His statement was voluntary and admissible. Nothing in the record indicates "official, coercive conduct of such a nature" that any statement obtained is "unlikely to have been the product of an essentially free and unconstrained choice by its maker." *Mason v. State*, 116 S.W.3d 248, 257 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (citing *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995)). After he admitted shooting the victim, appellee timely received *Miranda* warnings, stated he understood them, and signed the warning sheet. He then voluntarily continued to talk to officers.

Thus, the record does not support an implicit finding that appellant's statement was involuntary. We sustain the State's second issue.

## Conclusion

Having sustained the State's issues, we reverse the trial court's suppression order and remand the case to the trial court for further proceedings.

/Michael J. O'Neill/
MICHAEL J. O'NEILL
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

111551F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

THE STATE OF TEXAS, Appellant

No. 05-11-01551-CR     V.

AUBREY MALENA, Appellee

On Appeal from the 203rd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F09-20987-P.
Opinion delivered by Justice O'Neill,
Justices Moseley and Lewis participating.

      Based on the Court's opinion of this date, the judgment of the trial court is **REVERSED** and the cause **REMANDED** to the trial court for further proceedings.

Judgment entered this 6th day of June, 2013.

/Michael J. O'Neill/

MICHAEL J. O'NEILL
JUSTICE