

# NUMBER 13-13-00572-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**JESUS ALEJANDRO RODRIGUEZ,**                                        **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                     **Appellee.**

---

### On appeal from the 357th District Court
### of Cameron County, Texas.

---

# MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Benavides and Perkes
### Memorandum Opinion by Justice Benavides

By five issues, appellant Jesus Alejandro Rodriguez appeals his conviction for capital murder. *See* TEX. PENAL CODE ANN. § 19.03(a) (West, Westlaw through 2015 R.S.). Rodriguez asserts on appeal that: (1) his confession to U.S. authorities, taken in Mexico, was involuntary; (2) the trial court erred by allowing the State to submit four

alternative theories of capital murder which denied him the right to an unanimous verdict; (3) the trial court committed reversible error by denying his requested jury instruction on specific voluntariness[1]; (4) the trial court committed error by admitting hearsay evidence; and (5) the trial court committed error by allowing extraneous offenses into evidence. We affirm.

## I.   BACKGROUND

On March 1, 2005, Alex Villarreal's deceased body was found in a canal outside of San Benito, Texas.   Villarreal had been a witness to the murder of Juan Hernandez that occurred on October 1, 2004.   Villarreal was scheduled to testify against Rene Garcia, who faced charges for Hernandez's murder.   The investigation into Villarreal's death led authorities to believe Rodriguez was involved in Villarreal's murder.

On August 2, 2005, Cameron County Sheriff's Deputies received a phone call from the State Judicial Police in Matamoros, Tamaulipas, Mexico, that they had arrested Rodriguez, and offered the deputies the opportunity to speak with him.   That same day, Captain Jose Garza, Lieutenant Domingo Diaz, and Investigator Victor Alvarado of the Cameron County Sheriff's Office traveled to Matamoros to speak with Rodriguez.

Mexican authorities allowed the U.S. investigators to meet with Rodriguez in an interrogation room while one of their officers was present to videotape the interrogation. Prior to giving his statement to U.S. authorities, the sheriff's deputies read Rodriguez his *Miranda* rights and Rodriguez waived each one.[2]   The reading of Rodriguez's *Miranda*

---

[1]  Defendants can be entitled to a jury instruction related to specific facts surrounding the voluntariness of their statements.   *See* TEX. CODE OF CRIM. PROC. ANN. art. 38.23 (West, Westlaw through 2015 R.S.).

[2]  *See Miranda v. Arizona*, 384 U.S. 436 (1966).

rights, as well as his respective waivers, were captured on videotape. In his statement, Rodriguez admitted to shooting Villarreal three times with a .9mm handgun.

Following his arrest in 2011, Rodriguez sought to suppress his statement to the Cameron County Sheriff's Investigators. During a pre-trial suppression hearing, Rodriguez testified that Mexican authorities beat and tortured him, which caused him to give an involuntary statement to the sheriff's investigators regarding his role in Villarreal's murder. The trial court denied Rodriguez's motion to suppress and expressly stated on the record that it did not believe Rodriguez's testimony that he was abused by Mexican authorities. The trial court also found the Cameron County authorities had no causal connection to the Mexican authorities.

Following a jury trial on guilt-innocence, Rodriguez was found guilty of capital murder and automatically sentenced to life in prison in the Texas Department of Criminal Justice–Institutional Division. *See* TEX. PENAL CODE ANN. §§ 19.03(a), 12.31(a)(2) (West, Westlaw through 2015 R.S.). This appeal followed.

## II. VOLUNTARY CONFESSION GIVEN

By his first issue, Rodriguez argues that the trial court committed reversible error by denying his motion to suppress his confession because it was not voluntarily given when taken by Cameron County Sheriff's officials in Mexico. To support this contention, Rodriguez claims the statement was given as a result of coercion, physical abuse, and implied threats by Mexican authorities.

## A. Standard of Review

We review a trial court's suppression ruling under a bifurcated standard. *Hubert v. State*, 312 S.W.3d 554, 559 (Tex. Crim. App. 2010). Appellate courts must view all of

3

the evidence in the light most favorable to the ruling. *Vasquez v. State*, 453 S.W.3d 555, 564 (Tex. App.—Houston [14th Dist.] 2014, pet. granted). The trial court is the "'sole and exclusive trier of fact and judge of the credibility of the witnesses and evidence presented at a hearing on a motion to suppress, particularly when the motion is based on the voluntariness of a confession." *Delao v. State*, 235 S.W.3d 235, 238 (Tex. Crim. App. 2007). Regarding findings of fact, especially when those findings are based on an evaluation of credibility and demeanor, we review the trial court's rulings under an abuse of discretion standard. *See Xu v. State*, 191 S.W.3d 210, 215 (Tex. App.—San Antonio 2005, no pet.); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We afford almost total deference to a trial court's determination of historical facts supported by the record. *See id.* However, "the trial court's resolution of mixed questions of law and fact, which does not turn on an evaluation of credibility and demeanor, is reviewed *de novo*." *Xu*, 191 S.W.3d at 215. The court of appeals is obligated to "uphold the trial court's ruling on appellant's motion to suppress if that ruling was supported by the record and was correct under any theory of law applicable to the case." *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003) (en banc).

## B.    Applicable Law

The "United States Supreme Court has held that the determination as to whether a confession was voluntarily rendered must be analyzed by examining the totality of the circumstances." *Delao*, 235 S.W.3d at 239; *see Arizona v. Fulminante*, 499 U.S. 279, 285–86, 111 S.Ct. 1246 (1991). When a defendant "moves to suppress a statement on the ground of 'involuntariness,' the due process guarantee requires the trial court to hold a hearing on the admissibility of the statement outside the presence of the jury."

4

*Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995) (en banc). "The burden of proof at the hearing on admissibility is on the prosecution, which must prove by a preponderance of the evidence that the defendant's statement was given voluntarily." *Id*; *see Colorado v. Connelly*, 479 U.S. 157, 169, 107 S.Ct. 515, 523 (1986).

"A statement is 'involuntary,' for the purposes of federal due process, only if there was official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker." *Alvarado*, 912 S.W.2d at 211. "The focus is on whether the behavior of the State's law enforcement officials was such as to overbear the will of the accused and bring about a confession not freely determined." *Green v. State*, 934 S.W.2d 92, 99–100 (Tex. Crim. App. 1996). "Courts look to whether the voluntary relinquishment was 'the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Martinez-Hernandez v. State*, 04-13-00820-CR, ___S.W.3d___, 2015 WL 3775293, at *6 (Tex. App.—San Antonio, no pet. h.) (quoting *Joseph v. State*, 309 S.W.3d 20, 24 (Tex. Crim. App. 2010)); *see Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135 (1986). "Only when the totality of the circumstances surrounding the interrogation, including defendant's experience, background, and conduct, show an 'uncoerced choice' was made with full awareness of the nature of the right and the consequences of abandoning that right may a court properly conclude that the *Miranda* rights were knowingly, intelligently, and voluntarily waived." *Id*. (quoting *Joseph*, 309 S.W.3d at 24). "Absent [coercive] police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law. *Alvarado,* 912 S.W.2d at 211 (citing *Connelly*, 479 U.S. at 164).

**C.    Discussion**[3]

Rodriguez contends that he was abused at the hands of Mexican authorities and the abuse caused his statement to be involuntary.   In order for the actions of Mexican authorities to invalidate Rodriguez's statement, there must be a causal connection or direct relationship between the Mexican police alleged actions and the Cameron County Sherriff's Office.   *See id.*   Captain Garza testified that the sheriff's office was notified by the Mexican state police that Rodriguez was in their custody for an unrelated offense that took place in Mexico.   Captain Garza stated that in 2005, the two offices communicated about defendants in their respective custodies who had active warrants in either jurisdiction, but that was the extent of the two agencies' interaction.   Once he was alerted by Mexican authorities of Rodriguez's arrest, Captain Garza, along with two fellow deputies, traveled to Matamoros, Mexico to speak with Rodriguez.

Upon arrival, Captain Garza gave the Mexican authorities copies of Rodriguez's active U.S. warrants, but did not provide the Mexican authorities with factual details regarding those arrest warrants.   Captain Garza testified that his officers were then allowed to speak to Rodriguez.   Captain Garza stated that Rodriguez was given his statutory *Miranda* warnings multiple times, indicated he understood those warnings, waived them each time, and gave a statement freely and voluntarily.   Rodriguez then gave both a written and oral statement to the Cameron County Sherriff's deputies in

---

[3] Although Rodriguez's motion was titled "Motion to Suppress," once the issue of coercion to obtain the confession was brought forth by Rodriguez, the trial court conducted a hearing on the issue of voluntariness of the statement during the suppression hearing.   Although the trial court is required to enter written findings of fact and conclusions of law following a voluntariness hearing, the trial court is allowed to dictate its findings and conclusions into the reporter's record.   *See Murphy v. State*, 112 S.W.3d 592, 601 (Tex. Crim. App. 2003) (en banc); TEX. CODE CRIM. PROC. ANN. art. 38.22 (West, Westlaw through 2015 R.S.).   The trial court in this case performed the latter, and thus, satisfied the requirement in Article 38.22.

Mexico. At the pre-trial hearing, the State conceded the written statement did not comply with the requirements of Article 38.22 of the code of criminal procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22. The State notified the trial court and Rodriguez during the pre-trial hearing that they would not use the written statement unless necessary for rebuttal during the course of trial.

In his statement, Rodriguez told the sheriff's investigators that on the day Villarreal went missing, Villarreal picked him up in Villarreal's vehicle, and the two drove around drinking alcohol and taking pills. While driving around with Villarreal, Rodriguez stated that Villarreal received a call on his cell phone, which Rodriguez answered. Rodriguez claimed that the person calling told Rodriguez to "get rid of" Villarreal, which Rodriguez interpreted as an order to kill Villarreal. Rodriguez and Villarreal drove to the area known as Las Piedritas, outside of San Benito, and Rodriguez shot Villarreal three times, killing him. Rodriguez stated he dumped Villarreal's body into the canal. Rodriguez said he killed Villarreal because he was messed up on drugs and believed he would be compensated for the murder. Rodriguez further told authorities that he thought the money he got for killing Villarreal would be "his ticket to freedom out of there." In addition, Rodriguez also stated that he was told by someone on the phone to take Villarreal's car to the international bridge nearby and leave it there with the keys inside. Rodriguez complied with these orders. Rodriguez stated that following Villarreal's murder, he knew he was a suspect and fled to Mexico "a day or two" after the murder, with his girlfriend. In the video, Rodriguez is compliant with the Cameron County Sheriff's Office deputies and willingly speaks to them. During the interview, Rodriguez's face appears slightly swollen on one side. Captain Garza testified that when they asked

7

Rodriguez about it, Rodriguez told them he had a toothache or problem with his tooth. At the end of the video interview, Rodriguez asks sheriff's investigators whether he can be returned to the United States, since he was a United States citizen.

Captain Garza testified both during the hearing and at trial, that at the time of his video interview, Rodriguez never told them about any abuse or mistreatment by the Mexican police. During his testimony at trial, Captain Garza said if Rodriguez would have told them about the alleged abuse, he would have stopped the interview and not taken a statement because it would have been improper. A few days after he returned from Mexico, Captain Garza testified that he received a phone call from the United States Consulate regarding allegations that Rodriguez was abused by Mexican authorities. Captain Garza said his understanding of the allegations indicated that Rodriguez had been beaten and had a bag placed over his head. Captain Garza testified that the consulate officer believed Rodriguez had been subject to abuse, but Rodriguez never formally complained. Despite these revelations, Captain Garza stated that he believed that Rodriguez's statement was given voluntarily. Although Captain Garza agreed that he saw injuries consistent with the consulate officer's notes[4], when Rodriguez was asked about them, he told them he had fallen down and had a problem with his tooth.

At the pre-trial suppression hearing, Rodriguez testified and stated that prior to Cameron County deputies arriving, the Mexican police wanted him to confess to crimes

---

[4] The United State Consulate officer's notes indicated Rodriguez had a swollen face and bruising on his wrists and arms, and the consulate officer suspected abuse from Mexican authorities. The consulate notes were admitted as business records with the appropriate accompanying affidavit. *See* TEX. R. EVID. 402 (West, Westlaw through 2015 R.S.). The time frame required for business records to self-authenticate had not been met, but both sides agreed to waive the required time frame. *See id.* The officer was unable to be located prior to trial.

8

that occurred in Mexico and placed a plastic bag over his head when he would not cooperate with them. Rodriguez testified that he passed out from the incident. He stated he feared for his life and felt intimidated by the Mexican authorities. Rodriguez testified his face was swollen in the video statement from being hit by the Mexican authorities. Rodriguez claimed that he refused to speak with the Cameron County deputies, but the Mexican police repeated the plastic bag tactic again in the presence of the Cameron County deputies. Rodriguez testified that he asked Garza and Diaz for help, but they allowed the abuse to continue. Rodriguez stated he felt forced to give the statement to the Cameron County authorities and only did so because he felt pressured. However, Rodriguez also testified that no one from the Cameron County Sheriff's Office ever abused him, admitted he did understand his rights at the time he gave his statement, and was not forced to admit to other crimes committed in the United States while in Mexico.

At the end of the hearing, the trial court denied the motion to suppress and made its ruling on the record. The trial court stated:

> I have serious doubts that the defendant's testimony that he was abused by the Mexican police authorities is credible. Even if it were, there is no connection with any of that that ties into the actions or conduct of the Cameron County officials.
>
> I do not find that the statement that the defendant made on the video was coerced and that it was not voluntary. It's plain to me that the defendant agreed to talk to the officers. Whether that was wise on his part, that's another story; but he agreed to talk to the officers, and there is no indication from what I see that he was under some duress or pressure or improper influence to talk to them.
>
> And so, therefore, I will deny the motion to suppress the video statement.

In reviewing the trial court's ruling under an abuse of discretion, we uphold the

9

ruling that the statement was voluntarily given to Cameron County authorities. The trial court determines the credibility of the witnesses based on their testimony and demeanor during the hearing itself. In evaluating the totality of the circumstances, regarding the questioning of Rodriguez and his allegations of abuse, no causal connection was shown to exist between the actions of the Cameron County Sheriff's Office and the actions of the Mexican police. Garza was asked about any relationship while he testified and stated they only occasionally would exchange information between the two agencies, but they never participated in investigations with the Mexican authorities. Additionally, the trial court was able to listen to the testimony of Rodriguez himself. When the trial court issued its findings on the record, it stated did not find Rodriguez credible or any proof of evidence to substantiate his claims. Accordingly, we hold that the trial court did not abuse its discretion by denying Rodriguez's motion to suppress the videotaped statement and allowing its admission into evidence during the trial. We overrule Rodriguez's first issue.

### III.    JURY CHARGE WAS PROPER

By his second issue and third issue, which we will address together, Rodriguez argues that the trial court committed reversible error in the jury charge by submitting four alternative theories for committing capital murder in one paragraph and denying his requested jury instruction regarding specific voluntariness of his videotaped statement. Rodriguez claims by not submitting separate paragraphs for each theory of capital murder, he was denied his right to a unanimous jury verdict and he should have been entitled to an article 38.23 instruction in the jury charge. *See* TEX. CODE CRIM. PROC. art. 38.23.

## A.    Standard of Review

In reviewing a challenge to a jury charge, we first must determine if the jury charge contained error. *Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015).   If error is found, we then "analyze the harm resulting from the error." *Id.*   If "an error is preserved with a timely objection . . .then the jury-charge error requires reversal if the appellant suffered some harm as a result of the error." *Sanchez v. State*, 376 S.W.3d 767, 774 (Tex. Crim. App. 2012) (citing *Almanza v, State*, 686 S.W.2d 157, 171) (Tex. Crim. App. 1985) (en banc)).   But if the "defendant never presents a proposed jury instruction (or fails to object to lack of one), any potential error in the charge is reviewed only for 'egregious harm' under *Almanza*." *Oursbourn v. State*, 259 S.W.3d 159, 174 (Tex. Crim. App. 2008).   The failure to preserve jury-charge error is not a bar to appellate review, but rather it establishes the degree of harm necessary to the reversal. *Warner v. State*, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008).

If the "error is preserved with a timely objection. . .then the jury-charge error requires reversal if the appellant suffered some harm as a result of the error." *Sanchez,* 376 S.W.3d at 775 (citing *Almanza*, 686 S.W.2d at 171).   When an "appellant d[oes] not object to the charge, the error does not result in reversal 'unless it was so egregious and created such harm that appellant was denied a fair trial.'" *Warner*, 245 S.W.3d at 461 (citing *Almanza*, 686 S.W.2d at 171).   "Egregious harm deprives appellant of a fair and impartial trial." *Trejo v. State*, 313 S.W.3d 870, 871 (Tex. App.—Houston [14th Dist.], pet. ref'd.) (citing *Almanza*, 686 S.W.2d at 171).   "Errors that result in egregious harm are those that affect the 'very basis of the case,' 'deprive the defendant of a valuable right,' or 'vitally affect a defensive theory.'" *Warner,* 245 S.W.3d at 461–62 (citing *Hutch*

11

*v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996) (en banc)).

**B.     Applicable Law and Discussion**

        **1.     Alternate Theories of Capital Murder**

The "Code of Criminal Procedure provides that the trial court 'must deliver to the jury. . . .a written charge distinctly setting forth the law applicable to the case.'" *Sanchez*, 376 S.W.3d at 773; *see* TEX. CODE CRIM. PROC. art. 36.14 (West, Westlaw through 2015 R.S.).    The Texas Court of Criminal Appeals has held "that alternate pleading of the differing methods of committing one offense may be charged in one indictment." *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991) (en banc).    "Although the indictment may allege the differing methods of committing an offense in the conjunctive, it is proper for the jury to be charged in the disjunctive."    *Id.*    "It is appropriate where the alternate theories of committing the same offense are submitted to the jury in the disjunctive for the jury to return a general verdict if the evidence is sufficient to support a finding under any of the theories submitted."    *Id.*    The jury does not necessarily have to agree on the manner or means of the murder, but they need "only unanimously agree that [the] appellant caused the death of the complainant."    *Sanchez*, 376 S.W.3d at 774.

The State alleged four alternative theories in the indictment to prove that Rodriguez committed the offense of capital murder.    Specifically the State alleged that Rodriguez intentionally caused the death of Villarreal by killing Villarreal with a handgun while:    (1) in the course of committing or attempting to commit the offense of kidnapping of Villarreal; (2) in the course of committing or attempting to commit the offense of robbery of Villarreal; (3) in the course of committing or attempting to commit the offense of obstruction or retaliation against Villarreal; or (4) for remuneration or the promise of remuneration from

12

Rene Garcia, to-wit: U.S. and/or foreign currency.   *See* TEX. PENAL CODE ANN. § 19.03. Although Rodriguez argues the trial court denied his fundamental right to a unanimous jury by submitting the four alternative ways to commit capital murder in one paragraph in the jury charge, this was not error.   *Id.*   In the jury charge, under section 9.1, the trial court listed out the four alternative ways Rodriguez could have committed capital murder breaking each element into its own line.   Under section 9.3 of the jury charge, the trial court reiterated the four ways Rodriguez could have committed capital murder by placing each alternative in its own paragraph.   Nowhere in the jury charge does the trial court place all four alternatives into one paragraph as Rodriguez alleges.   However, even if it did, it would not have constituted error.

The jury was properly charged in the disjunctive with regards to the underlying aggravating felonies necessary to prove capital murder.   Here, as in *Sanchez*, "because the indictment permitted a conviction under four alternatives for murder, the State could obtain a conviction if any of the alternatives were proven."   *Sanchez*, 376 S.W.3d at 774. We find *Kitchens* and its progeny to be good law and continue to follow it.   *See Kitchens*, 823 S.W.2d at 258.   Here, the jury charge was proper and the State was allowed to prove capital murder under any of the four theories alleged in the indictment.   We overrule Rodriguez's second issue.

**2.    Specific Voluntariness of a Confession**

A defendant under Texas law:

> may claim that his statement was not freely or voluntarily made and thus may not be used as evidence against him under several theories: (1) Article 38.22, §6–general voluntariness; (2) *Miranda v. Arizona* as expanded in Article 38.22, §§ 2 and 3 (the Texas confession statute); or (3) the Due Process Clause.

13

*Oursbourn*, 259 S.W.3d at 169.  The "first step in deciding upon an appropriate jury instruction is identifying the theory of involuntariness."  *Id.*  A confession can be "involuntary under the Due Process Clause only when there is police overreaching."  *Id.* "Even if a confession is not the product of a meaningful choice (for example, when made in response to hallucinations or to a private person's threat), it is nonetheless 'voluntary' within the meaning of the Due Process Clause absent some coercive police activity."  *Id.* at 170.   "Coercive government misconduct renders a confession involuntary if the defendant's 'will has been overborne and his capacity for self-determination critically impaired.'"  *Contreras v. State*, 312 S.W.3d 566, 574 (Tex. Crim. App. 2010) (quoting *Schneckloth v. Bustamante*, 412 U.S. 218, 225–26, 93 S.Ct. 2041 (1973)).   "In Texas, if there is a disputed fact issue about whether this type of coercive practice was employed– by either an officer or a private citizen[5]–to wring a confession out of a suspect against his will, a specific exclusionary-rule instruction under Article 38.23 is appropriate."  *Oursbourn*, 259 S.W.3d at 178.

"Under Texas statutory law, there are three types of instructions that relate to the taking of confessions:   (1) a 'general' Article 38.22, § 6 voluntariness instruction; (2) a 'general' Article 38.22, § 7 warnings instruction (involving warnings given under § 2 and § 3); and (3) a 'specific' Article 38.23(a) exclusionary-rule instruction."  *Oursbourn,* 259 S.W.3d at 173.  "The Section 6 'general' instruction asks the jury: 'Do you believe, beyond a reasonable doubt, that the defendant's statement was voluntarily made?   If it

---

[5]  *Oursbourn* references *Miles v. State* when discussing the role played by a private citizen.  *See Miles v. State*, 241 S.W.3d 28, 31 (Tex. Crim. App. 2007).   However, *Miles* deals primarily with private-citizen arrests, not confessions, and further held that violations of the law committed by private citizens in order to effectuate an arrest do not necessarily implicate Article 38.23.  *See id.*

was not, do not consider the defendant's confession.'" *Id.* "The Article 38.23(a) 'specific' instruction is fact-based: For example, 'Do you believe that Officer Obie held a gun to the defendant's head to extract his statement? If so, do not consider the defendant's confession.'" *Id.* at 173–74.

Here, the trial court charged the jury with a general instruction under article 38.22, § 6 relating to voluntariness, but Rodriguez alleges the trial court should have also given him an instruction under article 38.23 regarding specific voluntariness. *See* TEX. CODE CRIM. PROC. art. 38.22, 38.23. The State argues that the appropriate instruction was given in the jury charge because Rodriguez did not raise a factual issue entitling him to an article 38.23 instruction. *See id.*

Article 38.22, section 6 is "'the law applicable' to any case in which a 'question' is raised and litigated as to the 'general' voluntariness of a statement of an accused." *Oursbourn,* 259 S.W.3d at 180 (internal quotations omitted). "The trial judge must then (1) make an independent determination that the statement was made under voluntary conditions; and then (2) instruct the jurors that they shall not consider the statement for any purpose unless they believe, beyond a reasonable doubt, that the statement was made voluntarily." *Id* at 180–81. Article 38.23 is "'the law applicable' to any case in which a specific, disputed issue of fact is raised concerning the constitutional voluntariness of the making of the defendant's statement." *Id.* at 181. "These are statutorily mandated instructions and the trial judge must include them in the jury instructions when the voluntariness of a defendant's statement is at issue." *Id.*

In order to be entitled to an article 38.23 instruction,

a defendant must establish three foundation requirements. . . .(1) the

15

evidence heard by the jury must raise an issue of fact; (2) the evidence on that fact must be affirmatively contested; and (3) the contested factual issue must be material to the lawfulness of the challenged conduct in obtaining the statement claimed to be involuntary.

*Oursbourn,* 259 S.W.3d at 177. "The defendant must offer evidence that, if credited, would create a reasonable doubt as to a specific factual matter essential to the voluntariness of the statement." *Id.*; *see Madden v. State*, 242 S.W.3d 504, 513 (Tex. Crim. App. 2007). "A cross-examiner's questions do not create a conflict in the evidence, although the witnesses' answers to those questions might" *Id.* Disputed evidence must be brought forth by an appropriate witness. *See Oursbourn,* 259 S.W.3d at 177. "The cross-examiner cannot create a factual dispute for purposes of an Article 38.23(a) instruction merely by his questions. It is only the answers that are evidence and may create a dispute." *Madden*, 242 S.W.3d at 514.

Although Rodriguez's trial counsel asked questions of witnesses regarding the alleged abuse of the Mexican authorities, the record does not contain evidence that the Cameron County Sheriff's Office was involved in any alleged abuse. Captain Garza and Lieutenant Diaz both testified that they were not aware of any abuse of Rodriguez during the time he agreed to speak with them and the exchange on cross-examination between the two officers and Rodriguez's trial counsel was not enough to raise a genuine issue of fact sufficient to warrant the article 38.23 instruction. *See* TEX. CODE CRIM. PROC. art. 38.23. However, the consulate notes and testimony of Rafael Solis did elicit information regarding the alleged abuse by Mexican authorities. But none of the information contained in the notes or given by Solis implicated the U.S. authorities in any alleged abuse of Rodriguez. Additionally, based on the decision in *Miles*, even if we would

16

consider the Mexican authorities as "private citizens," there is no testimony that the alleged abuse occurred in regards to any offenses in the United States. Solis testified that the Mexican authorities wanted information from Rodriguez regarding his crimes in Mexico, not the United States. Even assuming the consulate notes and testimony raised the fact issue, this information would not be material to the challenged conduct Rodriguez is seeking to receive an Article 38.23 instruction on, his confession. *See id.*

The testimony from the Cameron County Sheriff's officials do not raise any kind of relationship between the U.S. and Mexican authorities. Since there does not appear to be any causal connection between the two agencies, and the Cameron County Sheriff's deputies testified they had no knowledge of any alleged abuse prior to taking Rodriguez's statement, we do not find that a factual dispute was raised that entitled Rodriguez to an Article 38.23 instruction. *See id.* We hold that sufficient evidence was brought forth for a general voluntariness instruction under article 38.22, section 6, and, as a result, the trial court gave the proper instruction. *See* TEX. CODE CRIM. PROC. art. 38.22. Because we find no error in the jury charge instructions, there is no need to conduct a harm analysis. *See Ngo v. State*, 175 S.W.3d 738 (Tex. Crim. App. 2005) (en banc). We overrule Rodriguez's third issue.

## IV. EVIDENCE PROPERLY ADMITTED

By his fourth issue and fifth issue, which we will address together, Rodriguez complains the trial court committed error by allowing hearsay statements and certain extraneous offenses to be admitted improperly into evidence during the guilt-innocence phase of the trial.

17

**A.     Standard of Review**

We review a trial court's ruling to admit evidence for an abuse of discretion. *Taylor v. State*, 268 S.W.3d 571, 578–79 (Tex. Crim. App. 2008).   However, in order to reverse a trial court's determination, we must find the trial court's ruling lies outside the zone of reasonable disagreement.   *Id.*   In applying an abuse of discretion standard, we will not disturb the trial court's evidentiary ruling if it is correct under any applicable theory of law.   *De la Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).   Error in the admission of evidence is non-constitutional error and is subject to a harm analysis under Rule 44.2(b) of the Texas Rules of Appellate Procedure.   *See* TEX. R. APP. P. 44.2(b) (West, Westlaw through 2015 R.S.); *Taylor,* 286 S.W.3d at 592.   "We have construed this to mean that an error is only reversible when it has a substantial and injurious effect or influence in determining the jury's verdict."   *Id.*   "We should not overturn the conviction if we have fair assurance from an examination of the record as a whole that the error did not influence the jury, or had but a slight effect."   *Id.*

**B.     Applicable Law and Discussion**

**1.     Hearsay Testimony**

Hearsay is inadmissible unless it falls under a hearsay exception identified in the Rules of Evidence or is allowed by other rules prescribed by statute.   *Sanchez v. State*, 354 S.W.3d 476, 484 (Tex. Crim. App. 2011); *see* TEX. R. EVID. 803, 804 (West, Westlaw through 2015 R.S.).   "Once the opponent of hearsay evidence makes the proper objection, it becomes the burden of the proponent of the evidence to establish that an exception applies that would make the evidence admissible in spite of its hearsay character."   *Taylor*, 268 S.W.3d at 578–79.   The exceptions argued by the State are

18

found under Texas Rules of Evidence 803(1) and 804.   *See* TEX. R. EVID. 803(1), 804. Rule 803(1) describes a present sense impression and Rule 804 addresses forfeiture by wrongdoing.   *Id.*

### a.    Rule 803(1)

Rodriguez first complains that the trial court committed error by allowing witness Pamela Cavazos to testify regarding hearsay statements from Connie Gonzalez. [6] Cavazos testified about a conversation she had with Gonzalez, in which Gonzalez told Cavazos she was going to Mexico with Rodriguez shortly after Villarreal's murder. Rodriguez's counsel objected to this testimony on hearsay grounds.   In response to Rodriguez's objection, the State cited the present sense impression exception to the hearsay rule, and the trial court overruled Rodriguez's objection.   Without addressing the merits of Rodriguez's hearsay objection, we note that Rodriguez's trial counsel cross-examined Connie Gonzalez *inter alia* about the complained-of hearsay testimony regarding Gonzalez's conversation with Cavazos.   Gonzalez testified that she left with Rodriguez to Mexico.   The rule in Texas is "that overruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling."   *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) (en banc).   Therefore, even if we were to hold that the complained-of evidence was erroneously admitted hearsay evidence, we find such an error harmless in light of Rodriguez's cross-examination of Cavazos about the complained-of testimony, as well as the additional evidence throughout the trial that showed Rodriguez was later

---

[6]   Connie Gonzalez was Rodriguez's girlfriend at the time Villarreal's murder was committed.

19

located in Mexico.

        b.     Rule 804

Rodriguez also argues that the trial court reversibly erred by admitting a written statement given by Villarreal prior to his death regarding a separate case. Villarreal had been a witness to a prior murder and had given a statement to the investigating agency regarding that crime. The State introduced that statement into evidence through an investigator from the Harlingen Police Department involved in that case. Rodriguez objected stating it violated the confrontation clause and the State responded by saying the statement was not being offered for the truth of the matter asserted in this case and the defendant had committed forfeiture by wrongdoing. *See Crawford v. Washington*, 541 U.S. 36, 62 (2004). The trial court overruled the objection and allowed the statement to come in. However, both sides agreed that there should be a limiting instruction given to the jury.

"The Constitution gives the accused the right to a trial at which he should be confronted with the witnesses against him; but if a witness is absent by his own wrongful procurement, he cannot complain if competent evidence is admitted to supply the place of that which he has kept away." *Gonzalez v.* State, 195 S.W.3d 114, 117 (Tex. Crim. App. 2006); *see Crawford*, 541 U.S. at 62. The forfeiture by wrongdoing "doctrine was added to Rule 804 [of the Federal Rules of Evidence] to clarify that a party forfeits the right to object, on hearsay grounds, to the admission of a declarant's prior statement when the party's deliberate wrongdoing procured the unavailability of the declarant as a witness." *Gonzalez*, 195 S.W.3d at 119. "Courts have agreed that forfeiture requires (1) the declarant's unavailability, (2) as a result of the defendant's act of misconduct." *Id.*

20

at 120. The Texas Court of Criminal Appeals has held that "the doctrine of forfeiture by wrongdoing may apply even though the act with which the accused is charged is the same as the one by which he allegedly rendered the witness unavailable." *Id.* at 125.

Here, the State had charged Rodriguez with capital murder because he killed Villarreal to prevent him from testifying in another murder trial. In order to link Villarreal as a crucial eyewitness in the other murder case, Villarreal's statement was necessary to be brought before the jury. The introduction of Villarreal's statement was necessary to provide that link between the two cases. Although Villarreal's statement did not provide any information regarding his murder, it helped prove one of the alternate theories of capital murder under which Rodriguez was charged. Rodriguez was not able to confront and cross examine Villarreal due to his own misconduct: i.e. killing Villarreal. Because Villarreal was unavailable due to Rodriguez's misconduct, the introduction of this statement was allowable under the doctrine of forfeiture by wrongdoing. The trial court was correct to allow the statements by Villarreal into evidence. We overrule Rodriguez's fourth issue.

### 2. Extraneous Offenses

Rodriguez argues that the court should not have allowed testimony regarding extraneous offenses to come in as it violated Rule 403 and Rule 404(b) of the Texas Rules of Evidence. *see* TEX. R. EVID. 403, 404(b) (West, Westlaw through 2015 R.S). Specifically he complains of testimony from three witnesses: Ismael Luna, Richard Zavala, and Rafael Solis.

#### a. Rule 404(b)

"When a party attempts to adduce evidence of 'other crimes, wrongs, or acts,' in

21

order to preserve error on appeal, the opponent of the evidence must object under rule 404(b) in a timely fashion. *Almaguer v. State*, No. 13-12-00605-CR, \_\_\_S.W.3d\_\_\_, 2014 WL 5088386, at *11 (Tex. App.—Corpus Christi 2014, no pet.) (citing *Montgomery v. State*, 810 SW.2d 372, 387 (Tex. Crim. App. 1990)); *see* TEX. R. EVID. 404(b). "Once a complaint is lodged, it is incumbent upon the proponent of the evidence to satisfy the trial court that the 'other crime, wrong, or act' has relevance apart from its tendency 'to prove character of a person in order to show that he acted in conformity therewith.'" *Almaguer*, 2014 WL 5088386, at *11 (citing TEX. R. EVID. 404(b)). If the trial court finds there is no use other than to show character conformity, then the evidence is inadmissible. *See id.* "However, the proponent of the evidence may persuade the trial court that the 'other crime, wrong, or act' has relevance apart from character conformity" in order for such evidence to be deemed admissible. *Id.*; *see* TEX. R. EVID. 404(b).

"Merely introducing evidence for a purpose other than character conformity, or any of the other enumerated purposes in rule 404(b), does not, by itself, make that evidence admissible." *Webb v. State*, 36 S.W.3d 164, 179 (Tex. App—Houston [14th Dist.] 2000, pet. ref'd)); *see* TEX. R. EVID. 404(b). The "extraneous offense must also be relevant to a 'fact of consequence' in the case." *Webb*, 36 S.W.3d at 179 (citing *Rankin v. State*, 974 S.W.2d 707, 709 (Tex. Crim. App. 1996)).

b. Rule 403

"Once an objection is made under rule 403, the trial court is called upon to weight probativeness of the evidence against its potential for 'unfair' prejudice–that is, 'its tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Almaguer,* 2014 WL 5088386 at *11; *see* TEX. R. EVID. 403;

22

*Montgomery*, 810 S.W.2d at 389.   "Rule 403 imposes a duty upon the trial court to inquire from the opponent about the purported prejudice from the admission of evidence." *Almaguer*, 2014 WL 5088386 at *11.   "Once rule 403 is invoked, however, the trial court must engage in a balancing test."   *Id.*   "The language of rule 403 that evidence 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,' simply means that trial courts should favor admission in close cases, in keeping with the presumption of admissibility of relevant evidence."   *Id.*; *see* TEX. R. EVID. 403.   "Unfair prejudice does not arise from the mere fact that evidence injures a party's case.   Virtually all evidence that a party offers will be prejudicial to the opponent's case, or the party would not offer it."   *Casey v. State*, 215 S.W.3d 870, 883 (Tex. Crim. App. 2007).

### 1.    Ismael Luna

Luna testified about two instances which Rodriguez complains should not have been allowed before the jury.   The first instance was when Luna saw Rodriguez with a gun.   Luna testified he lived near Villarreal and shortly before Villarreal's body was discovered, Villarreal came to Luna's house with Rodriguez and another man.   Villarreal told Luna as they walked away from Rodriguez and the other man that "they wanted to kill him" and Villarreal seemed scared.   Luna also saw a black handgun laying on the seat near Rodriguez that same day.   In a hearing outside the presence of the jury, Rodriguez's trial counsel objected to this line of testimony.   The State argued it was allowable under rule 404(b) because it showed Rodriguez had a plan, knowledge, motive, and opportunity to kill Villarreal.   *See* TEX. R. EVID. 404(b).   Since Villarreal was murdered within days of the incident Luna recounted, the evidence was important to show

23

a plan or knowledge by Rodriguez, and Villarreal's statements were illustrative of this plan. The trial court overruled Rodriguez's objection and allowed the testimony to be heard by the jury. We find the trial court's ruling was proper and allowable under Rule 404(b). *See id.*

Rodriguez also argues that Luna was allowed to testify that Rodriguez told him to assault Richard Zavala, an individual who knew both Villarreal and Rodriguez. Luna's testimony concerning this request was confusing and he eventually denied that Rodriguez had told him to assault Zavala. The trial court excused the jury in order to delve further into the matter. Rodriguez's counsel objected to the jury hearing this information because it was a violation of the motion *in limine* ruled on pre-trial. The trial court agreed the reference was a violation of the motion *in limine* and gave the jury an instruction to disregard when the returned to the courtroom. Although the reference to the alleged assault request was improper, we do not find that it was a violation of Rodriguez's substantial rights or was enough to improperly influence the jury. *See Taylor*, 286 S.W3d at 592.

### 2.    Richard Zavala

Rodriguez next complains of the testimony of Richard Zavala. Zavala knew both Rodriguez and Villarreal. Zavala testified that he received multiple calls from Rodriguez in the days leading up to and following Villarreal's murder. Zavala recalled that in late February 2005, Rodriguez called him and told him to get Villarreal and "take care of business," which Zavala understood to mean kill Villarreal. Shortly after Villarreal went missing, Zavala received another call from Rodriguez where Zavala was told they "were going to kill him the same way they killed that guy [he believed referring to Villarreal], and

he would come out missing and be found by a man fishing." Zavala stated he received that call before Villarreal's body had been found in the canal. Rodriguez did not object to any of Zavala's testimony, either in the presence or outside the presence of the jury and thereby waived his complaint against this witness on appeal. *See* Tex. R. App. P. 33.1.

### 3. Rafael Solis

Rafael Solis testified about statements Rodriguez made to him while they both were in Mexico. Solis, at the time of trial, was a federal inmate who Rodriguez had lived with in Mexico. Solis testified that he visited Rodriguez at a Mexican jail and Rodriguez told him the Mexican police had held a paper bag over his head, trying to get him to give them information. At a hearing outside the presence of the jury, Rodriguez objected to allowing Solis to testify claiming that allowing Solis's testimony would introduce evidence of his offenses committed in Mexico. The State argued the information was relevant because Rodriguez opened the door to the voluntariness of his statement and treatment by the Mexican officers through his cross-examination of Solis. The trial court overruled Rodriguez's objection. Solis testified that Rodriguez had told him the Mexican authorities wanted the name of the person Rodriguez was working with in Mexico and that he passed out with the bag over his head. We find the testimony involving Rodriguez's offenses committed in Mexico was minimal and the trial court did not err in allowing the testimony to be heard by the jury, as it was proper rebuttal questioning. We overrule Rodriguez's fifth issue.

25

## V.    CONCLUSION

We affirm the judgment of the trial court.

GINA M. BENAVIDES,
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed the
22nd day of October, 2015.