

# NUMBER 13-14-00675-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

EDGAR GARCES DIAZ,                                                        Appellant,

v.

THE STATE OF TEXAS,                                                      Appellee.

## On appeal from the 357th District Court
## of Cameron County, Texas.

# MEMORANDUM OPINION
### Before Justices Rodriguez, Benavides, and Hinojosa
### Memorandum Opinion by Justice Benavides

By four issues, appellant Edgar Garces Diaz challenges his convictions for capital murder and aggravated assault. *See* TEX. PENAL CODE ANN. §§ 19.03(a)(2) (capital murder), 22.02(a)(2) (aggravated assault) (West, Westlaw through 2017 1st C.S.). Diaz alleges: (1) the trial court reversibly erred by denying his motion to suppress his statements into evidence; (2) that the evidence was insufficient to prove the element of retaliation necessary for capital murder; (3) the trial court committed charge error by not

properly including the lesser included offense of murder; and (4) the trial court committed error during the sentencing phase by proceeding without Diaz present. We affirm.

## I. BACKGROUND

Diaz was charged by a four-court indictment of: (1) the murder of Mayra Oyervides with a firearm; (2) the aggravated assault with a deadly weapon of Leonel Garcia; (3) the murder of Oyervides by committing an act clearly dangerous to human life; and (4) the capital murder of Oyervides by retaliation. *See id.* §§ 19.02, 22.02, 19.03 (West, Westlaw through 2017 1st C.S.).[1]

On April 1, 2013, Oyervides was shot and killed outside of her apartment in Harlingen. Her fiancé's nephew, Garcia, who lived with Oyervides, was also shot at, but was not injured during the shooting. Harlingen police recovered two surveillance videos from neighboring homes that showed two men walking toward Oyervides's apartment, one wearing an orange shirt and one wearing a blue shirt. Multiple witnesses in the area stated the two men were involved in the shooting. One of the videos showed a black minivan dropping the two men off near Oyervides's apartment. The investigation led Harlingen police to Diaz, Gabriel Vela, Margarito Garces, and Dorothy Sanchez. Vela and Sanchez were arrested for the murder in April. Diaz was arrested in August while re-entering the United States from Mexico.

Prior to trial on the merits, Diaz sought to suppress his statements to police. The trial court held a hearing in which Investigator Carlos Ramos and Joel Yanes of the Harlingen Police Department testified. Investigator Ramos stated he interviewed Diaz on August 4, 2014, the day Diaz was arrested. After Diaz waived his *Miranda* rights,

---

[1] Prior to trial, the State dismissed count 3, the charge for murder by committing an act clearly dangerous to human life. *See* TEX. PENAL CODE ANN. § 19.02 (West, Westlaw through 2017 1st C.S.).

2

Investigator Ramos spoke to him, but Diaz did not implicate himself in Oyervides's death. *See Miranda v. Arizona*, 384 U.S. 436, 478 (1966). At the end of the interview, Diaz asked to be returned to his jail cell, at which point Ramos ceased questioning and returned Diaz. The following morning, Investigator Yanes interviewed Diaz. After reading Diaz his *Miranda* rights a second time, Investigator Yanes explained to Diaz that he was the lead investigator and attempted to get Diaz to relay what had occurred. *See id.* Following a break in the interrogation, Investigator Yanes stated he felt Diaz was still willing to talk, read him his rights again, and Diaz gave Investigator Yanes a statement implicating himself in Oyervides's shooting. *See id.* After hearing the testimony, the trial court denied Diaz's motion to suppress his statements.

During trial, the State called multiple witnesses from Oyervides's neighborhood. Brenda Villarreal testified she heard gunshots, saw two men, one wearing an orange shirt and one wearing a blue shirt running towards a fence while trying to hide a handgun. Osiel Garcia, also a neighbor, testified he heard gunshots, saw two men, one wearing orange and one wearing blue who looked confused running down his alley, and it appeared the one in orange had a gun tucked in his waistband.

Leonel Garcia testified that Oyervides was engaged to his uncle and they lived in the same apartment. Garcia stated that around 6 p.m. on April 1, 2013, he was outside their apartment speaking to some individuals in a vehicle. Garcia said Oyervides was outside on the porch in front of the apartment. As Garcia's friends were leaving, he noticed two males approaching; one wore an orange shirt and the other a blue shirt. Garcia stated he had never seen them before. As Garcia climbed the stairs back to his apartment, he testified that the male in the orange shirt approached the bottom of the stairs and said

3

"Hey Homeboy." Garcia noticed that Diaz tried to pull out a gun, but it was stuck in his shirt, and Garcia took off running towards the apartment. Garcia testified that as he ran in the front door, he believed Oyervides was right behind him. Garcia told the jury that he ran and hid in a closet in the apartment and did not leave the closet until he heard his brother talking. When Garcia exited the closet, he saw Oyervides on the ground with blood around her. Garcia testified that he was "freaking out" and ran downstairs towards the alley, but the two men were already gone.

Harlingen Police Officer Joseph Lopez stated he was a member of the Crime Scene Response Team and located and recovered a pistol magazine in the alleyway. Officer Jorge Moreno testified he reviewed surveillance videos from neighborhood homes and was able to locate the black minivan that Diaz was seen exiting. Officer Sandra Moreno, also a member of the Crime Scene Response Team, recovered 9 mm bullet casings and projectiles from the crime scene that were 9mm caliber. Bradford Means, a Texas Department of Public Safety firearms analyst, testified that the seven casings submitted were all fired from the same gun, and the four bullets submitted were from the same gun as well. Forensic pathologist Elizabeth Miller described the five gunshot wounds Oyervides sustained, stating that at least two of them could have been the fatal shot.

The State also called Sandra Hernandez, who knew Diaz through Vela, Diaz's brother. Hernandez testified that Diaz, Vela, and their cousin, Margarito Garces, had been at her home on April 1, 2013 around 4:30 p.m. Hernandez stated that Diaz was wearing an orange shirt, Garces a blue shirt, and Vela was wearing a grey shirt. Hernandez said that Diaz and Garces left her home in a black minivan shortly after the 5 p.m. local newscast began, while Vela left about twenty minutes later in a gold vehicle.

4

Dorothy Lee Sanchez, a charged co-defendant, testified. Sanchez explained that she had children with Vela, and on April 1, 2013, Vela visited her place of employment asking to trade vehicles with her and borrow her black minivan. Sanchez stated that around 6 p.m., Vela called her to switch vehicles in Harlingen, near a restaurant. When she arrived at the restaurant, Sanchez said Vela was sitting in the driver's seat of the parked, black minivan. Vela entered the vehicle Sanchez was driving, and told her to drive away. According to Sanchez, Vela had her return to the minivan's location where he dropped her off. Harlingen police approached Sanchez shortly thereafter and questioned her about her prior whereabouts. Sanchez admitted she was not upfront with the officers initially and got scared when they informed her that her van had been seen on surveillance near the murder scene. Sanchez claimed she did not know or participate in the murder and was not aware Vela wanted her minivan for that purpose. Sanchez said she gave a statement to police after she was arrested, but had taken hydrocodone shortly before being arrested and does not remember the statement. Sanchez confirmed that Diaz was wearing orange that day, Garces was wearing blue, and Vela was wearing grey.

The State's final witnesses were Investigators Ramos and Yanes. Investigator Ramos testified that he spoke with Diaz shortly after Diaz's arrest at the international bridge when he re-entered the United States from Mexico. Investigator Ramos stated that Diaz never admitted to the murder. Diaz told him he had been taken by force to a ranch in Mexico, spoke to his parents while in Mexico, and admitted to knowing Vela and Garces. Investigator Ramos also relayed that at the end of the interview, Diaz stated he did not want to talk anymore and was taken back to his jail cell.

5

Investigator Yanes, the lead investigator in this case, spoke about Sanchez being questioned and stating the minivan was hers, when it was actually registered to Vela. Investigator Yanes said he knew about Investigator Ramos's initial interview with Diaz, but re-approached Diaz after reviewing the video to speak with him. After reading his *Miranda* warnings, Investigator Yanes testified that Diaz did not ask for an attorney or request that they cease their interview. *See id.* Investigator Yanes stated he ended the second interview in order to give Diaz a break, but Diaz never indicated he did not wish to speak to Investigator Yanes. According to Investigator Yanes, Diaz was told about possible pending charges against his parents in order to fully inform him of the investigation and consequences, not to threaten or coerce him. On cross examination, Investigator Yanes agreed that he spoke to Diaz between the second and third interview outside, off camera where Investigator Yanes had given Diaz some cigarettes he had requested. The State played part of the second and third interviews between Diaz and Investigator Yanes for the jury. In the third interview, Diaz confessed to Oyervides's murder, answering Investigator Yanes's questions, and even demonstrating actions regarding how the murder occurred.

The jury found Diaz guilty of capital murder and aggravated assault.[2] *See* TEX. PENAL CODE ANN. §§ 19.03(a)(2), 22.02(a)(2). After an outburst from Diaz following the trial court's reading of the verdicts, Diaz was removed from the courtroom and sentenced in absentia by the trial court to concurrent terms of life imprisonment and twenty years'

---

[2] The State dismissed count one of the indictment (murder) following the jury's verdict on count four (capital murder).

confinement in the Texas Department of Criminal Justice–Institutional Division for each respective conviction. This appeal followed.

## II. STATEMENT WAS VOLUNTARILY GIVEN

By his first issue, Diaz argues his statements given to police at the time of his arrest were illegally obtained. These statements were challenged during a pre-trial motion to suppress, in which the trial court denied the suppression.[3]

### A. Standard of Review

We review a trial court's suppression ruling under a bifurcated standard. *Hubert v. State*, 312 S.W.3d 554, 559 (Tex. Crim. App. 2010). Appellate courts must view all of the evidence in the light most favorable to the ruling. *Vasquez v. State*, 453 S.W.3d 555, 564 (Tex. App.—Houston [14th Dist.] 2014, pet. granted). The trial court is the "sole and exclusive trier of fact and judge of the credibility of the witnesses and evidence presented at a hearing on a motion to suppress, particularly when the motion is based on the voluntariness of a confession." *Delao v. State*, 235 S.W.3d 235, 238 (Tex. Crim. App. 2007).

Regarding findings of fact, especially when those findings are based on an evaluation of credibility and demeanor, we review the trial court's rulings under an abuse of discretion standard. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *see also Xu v. State*, 191 S.W.3d 210, 215 (Tex. App.—San Antonio 2005, no pet.). We afford almost total deference to a trial court's determination of historical facts supported by the record. *See Guzman*, 955 S.W.2d at 89. However, "the trial court's resolution of

---

[3] Diaz's case was abated so that the trial court could issue findings of fact and conclusions of law regarding the voluntariness of Diaz's statement to Harlingen police. The trial court issued its findings of fact and conclusions of law, and they were made a part of the record.

mixed questions of law and fact, which does not turn on an evaluation of credibility and demeanor, is reviewed *de novo*." *Xu*, 191 S.W.3d at 215. The court of appeals is obligated to "uphold the trial court's ruling on appellant's motion to suppress if that ruling was supported by the record and was correct under any theory of law applicable to the case." *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003) (en banc).

### B. Applicable Law and Discussion

In order to be admissible as evidence, the statements Diaz made to the Harlingen Police Department had to have been videotaped and comply with the dictates of article 38.22 of the code of criminal procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 (West, Westlaw through 2017 1st C.S.). Oral statements are governed by section 3 of the article. *Id.* at § 3. Section 3 states:

(a) No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless:

    (1) an electronic recording, which may include motion picture, video tape, or other visual recoding is made of the statement;

    (2) prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning;

    (3) the recording device was capable of making an accurate recording, the operator was competent, and the recording is accurate and has not been altered;

    (4) all voices on the recording are identified; and

    (5) not later than the 20th day before the date of the proceeding, the attorney representing the defendant is provided with a true, complete, and accurate copy of all recordings of the defendant made under this article.

*Id.* The State bears the burden of demonstrating that the defendant knowingly,

8

intelligently, and voluntarily waived his statutory and *Miranda* rights. *Howard v. State*, 482 S.W.3d 249, 255 (Tex. App.—Houston [1st Dist.] 2015, pet. denied).

### 1. Right to Remain Silent

During the motion to suppress hearing, both investigators from the Harlingen Police Department as well as Diaz testified. Investigator Ramos conducted Diaz's first interview and promptly discontinued it when Diaz requested to go back to his jail cell. Investigator Yanes re-approached Diaz the following day, and Diaz waived any of his rights and agreed to speak during the two subsequent interviews with Investigator Yanes.

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008) (quoting U.S. CONST. amend. V). If an individual in custody "indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Id.* (quoting *Miranda*, 384 U.S. 473). If a defendant has invoked his right to remain silent, we must then determine if law enforcement "scrupulously honored" his request before re-initiating contact. *See Mosely v. Michigan*, 423 U.S. 96, 104 (1975).

In *Mosley*, the Supreme Court established the following factors to consider:

1. whether the suspect was informed of his right to remain silent prior to the initial questioning;

2. whether the suspect was informed of his right to remain silent prior to the subsequent questioning;

3. the length of time between initial questioning and subsequent questioning;

4. whether the subsequent questioning focused on a different crime; and

5. whether police honored the suspect's initial invocation of the right to

9

remain silent.

*Id.*

In evaluating the first *Mosley* factor, Diaz was informed of his right to remain silent prior to any initial questioning. *See id.* It is undisputed that Diaz was under arrest when he was initially interviewed by Investigator Ramos. Regarding the second factor, Diaz was also informed of his right to remain silent prior to both the second and third interview conducted by Investigator Yanes. *See id.* The first two factors weigh in favor of "scrupulously honoring" Diaz's request.

The third factor relates to the length of time that has passed between Diaz's first, second, and third interviews. *See id.* Diaz's first interview terminated on the evening of August 4, 2013, and Yanes's re-initiation of the second interview did not occur until close to noon on August 5, 2013. A period of almost thirteen hours passed between the two interviews, therefore, the Harlingen police honored Diaz's request to "go back to his cell" and also weighs in favor of the police "scrupulously honoring" Diaz's request.

The fourth factor relates to whether the subsequent questioning focused on a different crime or the same one as before. *See id.* The focus of all three interviews with Diaz regarded the murder of Oyervides. This factor weighs against Harlingen police "scrupulously honoring" Diaz's request.

The final factor looks to whether the police honored Diaz's initial request to remain silent. *See id.* Investigator Ramos immediately terminated his interview with Diaz when Diaz stated he "wanted to go back to his cell." Diaz's invocation, although somewhat ambiguous, was honored and no one approached Diaz to speak to him again until the following day. This factor weighs in favor of "scrupulous honoring."

10

Having considered all the *Mosley* factors, we hold that Harlingen police "scrupulously honored" Diaz's rights. *See id.*

## 2. Statement Not Involuntary

Diaz also argues that Harlingen police threatened to arrest his parents, which caused his statement to be involuntary. However, the trial court in its findings of fact believed that "at the time the Officers advised the Defendant of the possible arrest of Defendant's parents, the Officers did have sufficient probable cause to arrest the Defendant's parents for their role in hindering the apprehension of the Defendant." Additionally, the trial court found that "the Officers never tell, or imply to the Defendant that unless he gives a statement or confesses to the crime, they will arrest the Defendant's parents."

Some federal circuit and state courts have "held that law enforcement officials can threaten to arrest a family member, without vitiating the voluntariness of a confession, if they can lawfully effectuate such an arrest (*i.e.*, if there is probable cause to arrest)." *Contreras v. State*, 312 S.W.3d 566, 577, n. 27 (Tex. Crim. App. 2010). Although in *Contreras*, the court of criminal appeals held there was no probable cause to arrest, therefore rendering Contreras's confession inadmissible, *see id.* at 566–67, in this case, there was probable cause to issue a warrant for the arrest of Diaz's parents, based on the trial court's findings. Because the trial court found that probable cause existed, Diaz's statements were not involuntary.

## 3. Conclusion

The trial court heard the testimony and denied the motion to suppress, allowing the statement to be played at trial. Since we defer to the trial court as the "'sole and exclusive

11

trier of fact and judge of the credibility of the witnesses and evidence presented at a hearing on a motion to suppress," we uphold the finding that the statement was voluntarily made because it is supported by the record. *See Delao*, 235 S.W.3d at 238. The trial court heard testimony from both sides and made its determination that Diaz's subsequent statements were not made in violation of his right to remain silent. We are obligated to "uphold the trial court's ruling on appellant's motion to suppress if that ruling was supported by the record and was correct under any theory of law applicable to the case." *Armendariz*, 123 S.W.3d at 404. We overrule Diaz's first issue.

### III. EVIDENCE IS LEGALLY SUFFICIENT

By his second issue, Diaz challenges the sufficiency of the evidence regarding retaliation to support his conviction.

### A. Standard of Review

When evaluating a sufficiency challenge, the reviewing court views the evidence in the light most favorable to the verdict to determine whether a rational jury could find the defendant guilty beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010) (plurality op.); *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979). In order to have reversal of a conviction on a claim of insufficiency of the evidence, Diaz must show that no rational jury could have found all the elements of the offense beyond a reasonable doubt. *Brooks*, 323 S.W.3d at 902. The jury is the sole judge of the credibility of the witnesses and the weight to be given to their testimony, and a reviewing court is not to substitute its judgment as to facts for that of the jury as shown through its verdict. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). When the reviewing court is faced with a record supporting contradicting inferences, the court must presume

12

that the jury resolved any such conflict in favor of the verdict, even if it is not explicitly stated in the record. *Id.*

A reviewing court must measure the sufficiency of the evidence by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997) (en banc)). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id*.

## B. Applicable Law and Discussion

Relevant to this case, a person commits an offense of capital murder if he commits murder as defined under section 19.02(b)(1) and the person commits the murder in the course of committing retaliation. *See* TEX. PENAL CODE ANN. §§ 19.03(a)(2) (capital murder), 36.06(a)(1), (2) (retaliation) (West, Westlaw through 2017 1st C.S.). Based on a hypothetically correct jury charge, we must determine if the evidence supported the conviction. *See Villarreal*, 286 S.W.3d at 327.

Diaz argues that he intended to cause harm to Garcia, not Oyervides. Oyervides happened to be in the wrong place during the shooting, and Diaz claims to have shot her as a "result of a [sic] act of panic in a time of passion and not as an intentional act of retaliation." However, in his third interview with Harlingen police, Diaz stated that Oyervides had turned around and was facing him, so he shot at her. Diaz also told Investigator Yanes that he was trying to scare Oyervides because he did not want her to call the police and he thought she was threatening to do so.

13

Retaliation is comprised of intentionally or knowingly harming or threatening to harm another by an unlawful act:

(1)    in retaliation for or on account of the service or status of another as a:

    (A)    public servant, witness, prospective witness, or informant; or

    (B)    person who has reported or who the actor knows intends to report the occurrence of a crime; or

(2)    to prevent or delay the service of another as a:

    (A)    public servant, witness, prospective witness, or informant; or

    (B)    person who has reported or who the actor knows intends to report the occurrence of a crime.

TEX. PENAL CODE ANN. § 36.06(a)(1), (2).   Based on Diaz's statement that he believed Oyervides was going to call the police following the gunfire that was directed at Garcia, we hold that there was legally sufficient evidence presented at trial to support the jury's finding of guilt under a hypothetically correct jury charge.  *See Villarreal*, 286 S.W.3d at 327.  We overrule Diaz's second issue.

### IV.    NO REVERSIBLE JURY CHARGE ERROR

By his third issue, Diaz alleges the trial court committed jury charge error by not including a lesser offense instruction of murder in the capital murder charge.

### A.    Standard of Review

"In analyzing a jury-charge issue, our first duty is to decide if error exists." *Rodriguez v. State*, 456 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd.) (citing *Almanza v. State*, 686 S.W.2d 157, 174 (Tex. Crim. App. 1985) (op. on reh'g)).  Only if error is found, do we then consider whether an objection to the charge was made and analyze for harm.  *Id.*  "The degree of harm necessary for reversal depends upon whether the error was preserved."  *Id.* (citing *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App.

14

1996)).

If "an error is preserved with a timely objection. . . . then the jury-charge error requires reversal if the appellant suffered some harm as a result of the error." *Sanchez v. State*, 376 S.W.3d 767, 774 (Tex. Crim. App. 2012) (citing *Almanza*, 686 S.W.2d at 171). The Court of Criminal Appeals "has interpreted this to mean that any harm, regardless of degree, is sufficient to require reversal." *Rodriguez,* 456 S.W.3d at 280.

To establish harm, the "appellant must have suffered actual, rather than theoretical, harm." *Warner v. State*, 245 S.W.3d 458, 461 (Tex. Crim. App. 2008). Neither the State nor the appellant bears the burden on appeal to prove harm. *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013).

**B. Applicable Law and Discussion**

Diaz filed a requested jury charge regarding a lesser offense of murder that stated:

Now, if you find from the evidence beyond a reasonable doubt that on or about the 1st day of April, 2013, in Cameron County, Texas, the defendant Edgar Garces Diaz, did then and there intentionally or knowingly cause the death of Mayra Bianey Oyervides, but you have a reasonable doubt as to whether the defendant committed the murder during the course of committing the offense of retaliation, then you will find the defendant guilty of murder, but not capital murder.

Unless you find from the evidence beyond a reasonable doubt that the defendant is guilty of murder, as defined herein, or if you have a reasonable doubt thereof, you will acquit the defendant of murder.

If you should find from the evidence beyond a reasonable doubt that the defendant is either guilty of capital murder or murder, but you have a reasonable doubt as to which offense he is guilty, then you should resolve the doubt in defendant's favor, and in such event, you will find the defendant guilty of the lesser offense of murder.

If you should find from the evidence that defendant is guilty of neither capital murder nor murder, or if you have a reasonable doubt thereof, you will find the defendant not guilty.

The State objected to Diaz's inclusion of the "benefit of the doubt" instruction because there was already a count for murder in the jury charge and it stated there needed to be some evidence Diaz did not commit the murder for retaliation. The trial court sustained the State's objection and denied the proposed charge.

The jury charge included counts one, three, and four of the indictment and contained the following:

**3.**
**Application of the Law to the Facts:  Capital Murder**

Now, if you find the evidence beyond a reasonable doubt that on or about April 1, 2013, in Cameron County, Texas, the defendant **EDGAR GARCES DIAZ A/K/A EDGAR DIAZ**, did then and there intentionally cause the death of MAYRA BIANEY OYERVIDES with a firearm, and the said defendant, **EDGAR GARCES DIAZ A/K/A EDGAR DIAZ**, was then and there in the course of committing or attempting to commit the offense of retaliation against MAYRA BIANEY OYERVIDES, then you will find the defendant guilty of capital murder as charged in Count IV of the indictment.

Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict "Not Guilty."

If you have found the defendant guilty of Capital Murder, skip paragraph 4, Murder, and next consider paragraph 5, Aggravated Assault. If you have found the defendant not guilty of the offense of Capital Murder, then you will next consider whether or not defendant is guilty of the offense of Murder, as charged in Count I of the indictment.

**4.**
**Application of the Law to the Facts:  Murder**

Now if you find from the evidence beyond a reasonable doubt that on or about April 1, 2013, in Cameron County, Texas, the defendant, **EDGAR GARCES DIAZ A/K/A EDGAR DIAZ**, did then and there intentionally or knowingly cause the death of an individual, namely MAYRA BIANEY OYERVIDES, by shooting MAYRA BIANEY OYERVIDES with a firearm, then you will find the defendant, **EDGAR GARCES DIAZ A/K/A EDGAR DIAZ**, guilty of murder as charged in Count I of the indictment.

Unless you so find beyond a reasonable doubt, or if you have a

16

reasonable doubt thereof, you will acquit the defendant and say by your verdict "Not Guilty."

Regardless of your verdicts as to the charges of Capital Murder and Murder, you must consider whether or not defendant is guilty of Aggravated Assault, as charged in Count II of the indictment.

(emphasis in original).

The general rule has been that, "where greater and lesser grades or degrees of an offense are charged, the court must upon the defendant's request give the jury a 'benefit of the doubt' instruction that, if the evidences leaves a reasonable doubt of the grade or degree of the offense, such doubt should be resolved in favor of the defendant." *Benavides v. State*, 763 S.W.2d 587, 589 (Tex. App.—Corpus Christi 1988, pet. ref'd). "This added instruction is given to clear up any confusion where the jury has no reasonable doubt that the defendant committed the offense, but is uncertain about the grade or degree of that offense." *Id.*

A similar requested instruction as the one in this case was made in *Kihega v. State*. 392 S.W.3d 828, 835–36 (Tex. App.—Texarkana 2013, no pet.). In *Kihega*, the defendant requested the trial court to include a "benefit of the doubt" instruction regarding the lesser-included offenses. *See id.* at 835. The jury charge did contain the lesser-included offenses of murder, manslaughter, and criminally negligent homicide. *See id.* In each application paragraph, the jury was instructed to find Kihega guilty of a particular offense if the jury found the respective elements to have been proven beyond a reasonable doubt. *See id.* The jury charge went on to instruct that if the jury had a reasonable doubt as to each particular offense, the charge instructed the fact-finder to acquit the defendant and next consider if he was guilty of the lesser-included offenses. *Id.* In that case, the Texarkana court of appeals found that "a trial court errs to refuse such a requested instruction." *Id.*

17

There, as in this case, because Diaz objected to the jury charge as given, we must reverse the trial court's judgment if it can be shown that Diaz suffered any actual harm. *See id.* at 836.

In order to determine if Diaz was harmed by the trial court's error, we look to: (1) the entire jury charge; (2) the state of the evidence including contested issues and the weight of the probative evidence; (3) the parties' arguments; and (4) all other relevant information in the record to determine harm. *See id.*

Regarding the state of the evidence, the evidence strongly supported a finding of guilt of capital murder. Diaz's third statement places him at the scene of Oyervides's murder and by his own admissions, establishes that Diaz shot at Oyervides multiple times. In addition to Diaz's statement, multiple witnesses were able to identify Diaz's clothing, including Garcia, the initial target of Diaz's shots. Besides the witnesses who identified a man in an orange shirt as the shooter, Sanchez and Hernandez confirmed that Diaz was wearing an orange shirt the day of the murder. Additionally, during closing arguments, the State made brief reference to the lesser included offense:

> Let's go on to number four. And number four—if you find that there is no or insufficient probable cause as to this first count of capital murder, you will conclusively, the very next one eliminates retaliation from the wording. And you can still find him guilty of murder if you find from all the evidence that he is responsible for knowingly and intentionally causing her death.

The State telling the jury not to consider lesser offenses unless first concluding Diaz was not guilty of the primary offense of capital murder is a correct statement of the law. *See Kihega*, 392 S.W.3d at 837.

In sum, the trial court's instructions clearly required a finding of guilt beyond a reasonable doubt on the charged offense of capital murder first. *See id.* The instructions

18

also clarified that if there was any doubt about Diaz's guilt of capital murder, then the jury should acquit Diaz of capital murder, and it should move on to the lesser offense of murder. *See id.* "Thus, the charge provided for consideration of alternative lesser crimes and authorized consideration and conviction on one of those lesser offense if the jury had reasonable doubt as to the primary charged offense." *Id.* Considering the entire charge, the state of the evidence, and the State's arguments, we conclude that the trial court error did not result in harm to Diaz. We overrule his third issue.

## V.    SENTENCING

By his fourth issue, Diaz states the trial court committed error by sentencing him in absentia.

### A.    Applicable Law and Discussion

Courts are required to pronounce sentence orally in the defendant's presence. TEX. CODE CRIM. PROC. ANN. art. 42.03, § 1(a) (West, Westlaw through 2017 1st C.S.); *Taylor v. State,* 131 S.W.3d 497, 500 (Tex. Crim. App. 2004); *Ex parte Madding,* 70 S.W.3d 131, 135 (Tex. Crim. App. 2002). The judgment, including the sentence assessed, is merely a written manifestation of that oral pronouncement. *See* TEX. CODE CRIM. PROC. ANN. art. 42.01, § 1 (West, Westlaw through 2017 1st C.S.); *Taylor,* 131 S.W.3d at 500; *Madding,* 70 S.W.3d at 135. Oral pronouncement of the sentence in the presence of the defendant is necessary because "the imposition of sentence is the crucial moment when all of the parties are physically present at the sentencing hearing and able to hear and respond to the imposition of sentence." *Madding,* 70 S.W.3d at 135. "[I]t is the pronouncement of sentence that is the appealable event, and the written sentence or order simply

memorializes it and should comport therewith." *Coffey v. State,* 979 S.W.2d 326, 328 (Tex. Crim. App. 1998).

We abated this case and remanded back to the trial court with instructions that comply with the code of criminal procedure's requirement that a sentence must be pronounced orally in front of a defendant. *See* TEX. CODE CRIM. PROC. ANN. art. 42.03, § 1(a). On January 6, 2017, Diaz was sentenced in person by the trial court to life imprisonment and twenty years' confinement to run concurrently. Therefore, Diaz has been properly sentenced and this issue is overruled as moot.

## VI. CONCLUSION

We affirm the judgment of the trial court.

GINA M. BENAVIDES,
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed the
2nd day of November, 2017.

20